# SUPREME COURT,

## STATE OF KANSAS.

## JANUARY TERM, 1906.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ADRIAN L. GREENE,
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. CLARK A. SMITH, } Justices.
Hon. SILAS W. PORTER,
Hon. CHARLES B. GRAVES,

---

M. J. Harrington v. E. J. Lowe *et al.*

No. 14,483.    (84 Pac. 570.)

SYLLABUS BY THE COURT.

Contracts—*Married Women—Validity.* In Kansas coverture affords no ground for declaring invalid a married woman's contract, even although she possesses no separate estate or separate trade or business.

Error from Phillips district court; Abel C. T. Geiger, judge. Opinion filed February 10, 1906. Reversed.

STATEMENT.

The plaintiff in error commenced the suit from which this proceeding in error arises for the purpose of foreclosing a real-estate mortgage executed by James and Malinda Suggs. B. A. Mason answered that he was the owner of the mortgaged premises, and traced his title from James and Malinda Suggs through their deed to the First National Bank of Orleans, Nebraska,

1—73 KAN.

the deed of a receiver for that institution to W. A. Green, and the deed of the latter to him. C. E. Nelson answered claiming that C. V. Rand was the owner of the land, and asked for the foreclosure of a mortgage given by Rand to one E. J. Lowe, and by the latter transferred to him. E. J. Lowe answered that, having obtained title by means of quitclaim deeds from the heirs of James Suggs, who was then deceased, and by means of a conveyance from the holder of a tax deed to the land, she had conveyed it to C. V. Rand. C. V. Rand answered admitting the conveyance to him, but, being doubtful in respect to the soundness of his title, and its freedom from encumbrances, he asked for relief against the Nelson mortgage, and against Lowe as his warrantor, in the event that a right superior to his should be established. The Selbys claimed a fractional interest in the land as heirs of James Suggs, deceased. The statute of limitations was pleaded as a bar to any kind of relief upon the plaintiff's mortgage.

The case was submitted upon an agreed statement of facts, which reads as follows:

"(1) It is stipulated between the parties hereto, for the purpose of this hearing, that the following are the facts in the case:

"(2) That James Suggs received a patent to the land in controversy from the United States, dated March 25, 1886, and on the same day the said James Suggs, together with Malinda Suggs, his wife, then residents of Phillips county, Kansas, borrowed of one Edward E. Parker the sum of $500, which sum they agreed to repay on the 1st day of March, 1891, all of which was evidenced by a note of that date, which is hereto attached and marked 'Exhibit A,' and that on the same day and as a part of the same transaction, and for the better securing of said note and interest as the same matured, the said James Suggs and Malinda Suggs executed to the said Edward E. Parker their certain mortgage deed conveying to the said Edward E. Parker the land in controversy, which mortgage is attached, marked 'Exhibit B,' and that said mortgage was duly filed for record on the 27th day of March, 1886.

" (3) That on the 1st day of January, 1886, the First National Bank of Orleans, Nebraska, was a going concern, duly organized under the national banking act, and continued to be a going concern until the 1st day of May, 1897, upon which date it became and was insolvent, and was so declared by the comptroller of the currency, and one P. O. Hedlund was duly appointed receiver thereof, and that thereafter and upon the resignation of said P. O. Hedlund one John W. McDonald was duly appointed receiver and continued to act as such until the affairs of said bank were wound up, which date was about the 1st day of January, 1903; that from the 1st day of January, 1886, up to the 1st day of May, 1897, and during all the time said bank was a going concern, George W. Burton was the president thereof; that on the 30th day of November, 1888, James Suggs and Malinda Suggs, his wife, executed a deed to the premises in controversy, in which the name of the grantee was blank, and delivered the same to George W. Burton, as president of said bank, such deed being a warranty with full covenants, and was made expressly subject to the mortgage hereinbefore recited; that thereafter the premises in controversy were shown in the reports of the bank as an asset thereof, and continued to be so shown until the year 1894, when the same was by order of the comptroller of the currency ordered, and was, charged off the books of said bank under the limitation imposed in the banking act itself; that during all the time said premises were listed as an asset of the bank drafts were issued by said bank and remitted by George W. Burton to the assignee of said mortgage and note, in payment of interest; that after said assets were charged off the books of said bank said George W. Burton remitted, on March 25, 1895, the interest due on March 1 of that year. On October 10, 1895, he remitted the interest due on September 1, 1895. On April 5, 1896, he remitted the interest due up to March 1, 1897.

" (4) That on or about the 22d day of May, 1889, the said James Suggs departed this life, leaving surviving him his widow, Malinda Suggs, and the following children and heirs at law, to wit: Eliza Suggs, Katie Suggs, Sarah E. Thompson, Sarah M. Selby, and Mary Selby, daughters, and Alexander Corbett and Sarah E. Corbett, children of a deceased daughter

and grandchildren of the said James Suggs. The said Alexander Corbett was also known as Harry Corbett. That on the 29th day of August, 1901, Malinda Suggs, the widow, and Eliza Suggs, single, Katie Suggs, single, Sarah E. Thompson and husband and Alexander Harry Corbett and Sarah E. Corbett conveyed to E. J. Lowe, by quitclaim deed, the premises in controversy, which deed was duly filed for record September 2, 1901; that on the 4th day of September, 1899, the county of Phillips, in the state of Kansas, acting by and through its officers, duly authorized thereunto, executed to one Eliza Rundle a tax deed to the premises in controversy, which deed was duly recorded on September 14, 1899, and on the 6th day of September, 1901, the said Eliza Rundle, single, conveyed the premises in controversy to the said E. J. Lowe, by quitclaim deed, which deed was duly recorded on September 14, 1901.

"(5) That afterward, and on the 20th of September, 1901, the said E. J. Lowe and husband conveyed to one C. V. Rand, by warranty deed, with full covenants, the premises in controversy, which deed was duly recorded on the 23d day of September, 1901; that said C. V. Rand purchased the said premises in controversy from E. J. Lowe in reliance upon the records, and without any notice of outstanding equities further than the record disclosed, and that he paid a full consideration to the said E. J. Lowe, in good faith and in reliance upon the warranty of said E. J. Lowe, to wit, the sum of $300 in cash and a mortgage of $350, executed as a part of the consideration of said purchase, dated September 20, 1901, payable to the order of E. J. Lowe; that on the 21st day of November, 1901, the said C. V. Rand duly filed in the office of the register of deeds of Phillips county, Kansas, an acknowledged caveat to the effect that said $350 mortgage was given as a part consideration of the purchase-price of said premises; that the title to the said premises was defective and that the consideration for said mortgage had in whole or in part failed, and that afterward, and on the 7th day of December, 1901, said note and mortgage were duly assigned to one John C. Bullard for a valuable consideration, as collateral security for a loan, and that he subsequently, upon payment of the debt, delivered the same to the said E. J. Lowe; that the said E. J. Lowe, on March 28, 1902, duly sold and

indorsed said note and assigned said mortgage before
its maturity to the said defendant C. E. Nelson, who
still owns the same, hereto attached as exhibits 'C',
'D', 'E', and 'F'; and that said Nelson was informed at
the time of said purchase that such caveat was on file.

"(6) That upon the appointment of the said P. O.
Hedlund as receiver of said First National Bank of
Orleans, Nebraska, he found among the books, papers
and assets in the vault of said bank the deed executed
by the said James Suggs and wife, as hereinbefore re-
cited, and took possession of the same, and delivered
the same, with the books and papers of said bank, to
his successor, John W. McDonald, and that said deed
was in all respects in the same condition as when it
was delivered to the said George W. Burton, as presi-
dent of said First National Bank of Orleans, Nebraska.

"(7) That on the 8th day of January, 1902, John
W. McDonald, as receiver of said First National Bank
of Orleans, having previously applied to the circuit
court of the United States for the district of Nebraska
for authority to sell the premises in controversy or the
interest of the bank therein, did on said date execute
to one W. A. Green a deed to said premises, executed
by him, the said John W. McDonald, as such receiver,
in accordance with and under the direction of said cir-
cuit court, which deed was duly filed of record on the
1st day of April, 1902; that on March 28, 1902, said
W. A. Green and wife executed and delivered to one
B. A. Mason their quitclaim deed to the premises in
controversy, which deed was duly recorded on the 1st
day of April, 1902; that the deed made by James Suggs
and wife, in blank, was on the 1st day of April, 1902,
filed for record in the office of the register of deeds of
Phillips county, Kansas, and at the time of the filing
thereof it had written or printed therein as the name
of the grantee, 'First National Bank of Orleans, Ne-
braska.'

"(8) It is further stipulated that the remittances
of interest made by George W. Burton were sent and
directed to one William A. Porter, Marshall, Mich.,
and were written upon the letter-heads of the bank of
which said Burton was president, and were signed
'George W. Burton.'

"(9) That shortly after the execution of the bond
the said Edward E. Parker indorsed the same as ap-
pears thereon, and for value sold and delivered it, to-

gether with the accompanying mortgage, to one Bethia L. Humphrey, and at the same time he placed the assignment on the said mortgage which appears thereon, but said assignment was unacknowledged, and was never recorded; that afterward, and on the 29th day of January, 1902, Edward E. Parker executed in writing an assignment of said mortgage to said Bethia L. Humphrey, duly acknowledging the execution of the same, which assignment was duly recorded on the 2d day of April, 1902; that on the 21st day of March, 1902, said Bethia L. Humphrey executed an assignment of said mortgage to one M. J. Harrington, which assignment was duly filed for record on the 2d day of April, 1902.

"(10) That on or about the year 1890 the said James Suggs and Malinda Suggs removed from Phillips county, Kansas, and continued at all-times thereafter until the death of said James Suggs to reside in or near Orleans, in the state of Nebraska, and said Malinda Suggs thereafter continued to be a resident of the state of Nebraska.

"(11) That after said James Suggs and family removed to the state of Nebraska said premises were unoccupied until about the year 1899, when the same were taken possession of by Eliza Rundle, under her tax deed. The only possession, if any, prior thereto, after the removal of said Suggs, being the constructive possession which the law would imply from ownership under said warranty deed from Suggs and wife, delivered as aforesaid to the said George W. Burton, as president of said First National Bank of Orleans, Nebraska.

"(12) It is further stipulated that neither the said defendants Selbys, intervenors herein, defendants Lowe and wife nor Rand and wife had any notice or knowledge of the assignment of said Suggs note and mortgage until said assignments were placed of record, in April, 1902.

"(13) It is further agreed that said defendants named in the last paragraph would testify that they had no notice of the payments of instalments of interest on said note so made by said George W. Burton, president of said First National Bank of Orleans, Nebraska.

"(14) That the consideration for which said tax deed was issued to Eliza Rundle was $71.96, at the

date of the issuance of said deed, on September 4, 1899.

"(15) That immediately upon the conveyance of the said land to the defendant C. V. Rand, as aforesaid, said Rand entered into the possession thereof, and immediately, and before the commencement of this suit, made lasting and valuable improvements thereon, but the value of such improvements and the value of the rents and profits of said land are not agreed to at this time, but are reserved until the final determination of this suit.

"(16) It is further agreed that all the foregoing facts are also agreed to upon behalf of and for the intervenors, Sarah M. Selby, Lewis Selby, and Mary Selby, and the defendant C. E. Nelson.

"(17) It is further stipulated in the above case that at the time the patent issued to said James Suggs to the premises in controversy, to wit, March 25, 1886, he, the said James Suggs, took a fee-simple title to the premises in controversy; that Malinda Suggs, his wife, had at the date of the execution of said note and mortgage no separate property or estate, and that her only right of property at that time was the marital right of expectancy in the said premises owned by and patented to the said James Suggs, and covered by the note and mortgage in controversy, and that on the death of the said James Suggs, she, the said Malinda Suggs, his widow, took a fee-simple title by inheritance, under the laws of the state of Kansas, to the undivided half interest of whatever interest, if any, the said James Suggs may have had at the time of his death in the said mortgaged premises in controversy, and that at the time said note and mortgage were given the said premises were used and occupied as the homestead of James and Malinda Suggs."

The court held that suit upon the note secured by the plaintiff's mortgage was barred by the statute of limitations; that Mason's title was invalid; that the Selbys had no interest in the land; that Rand was the owner of it; and that the Nelson mortgage, which pending the hearing had been assigned to Lowe, was a valid lien and should be enforced. Judgment was rendered accordingly, and the plaintiff, Harrington, and defendant Mason prosecute error.

*C. A. Lewis,* and *Burnham & Dashiell,* for plaintiff in error, and cross-petitioner in error, B. A. Mason.

*Flansburg & Williams,* for defendant in error Lowe.

The opinion of the court was delivered by

BURCH, J.: If the note in suit be a valid obligation enforceable against Mrs. Suggs, her absence from the state tolls the statute, and the plaintiff's mortgage may be foreclosed. If not, his suit is barred.

It is claimed that Mrs. Suggs is not bound because she had no separate estate when the note was given, and it does not appear to be a contract made in connection with any trade or business conducted on her sole and separate account; that the so-called married women's act permits contracts only in reference to these matters, and that, except as they are removed by statute, all the common-law disabilities of married women persist. The question for determination, therefore, is the measure of capacity to enter into contracts which a married woman possesses under the laws of Kansas. The legislative act referred to took effect October 31, 1868, and reads as follows:

"SECTION 1. The property, real and personal, which any woman in this state may own at the time of her marriage, and the rents, issues, profits or proceeds thereof, and any real, personal or mixed property which shall come to her by descent, devise or bequest, or the gift of any person except her husband, shall remain her sole and separate property, notwithstanding her marriage, and not be subject to the disposal of her husband or liable for his debts.

"SEC. 2. A married woman, while the marriage relation subsists, may bargain, sell and convey her real and personal property and enter into any contract with reference to the same in the same manner, to the same extent and with like effect as a married man may in relation to his real and personal property.

"SEC. 3. A woman may, while married, sue and be sued, in the same manner as if she were unmarried.

"SEC. 4. Any married woman may carry on any trade or business, and perform any labor or services,

on her sole and separate account; and the earnings of any married woman from her trade, business, labor or services shall be her sole and separate property, and may be used and invested by her in her own name." (Gen. Stat. 1901, §§ 4019-4022.)

Much stress is placed upon the words of the second section "enter into any contract with reference to the same"—that is, with reference to her real and personal property. In the case of *Deering v. Boyle,* 8 Kan. 525, 12 Am. Rep. 480, decided at the July, 1871, term, an action had been brought on a promissory note given by a married woman. She answered that when the note was given she was a married woman; that the note was given to the payee in satisfaction of her husband's sole, separate and individual debt; and that it was given without any benefit or consideration whatever moving to her. The district court sustained a demurrer to this defense, and this court affirmed the judgment. In the facts of the case there can be found no intimation that the woman had ever possessed any property, trade, or business. There is no presumption of law that she had done so, and if such had been the case the allegations of the answer show that her contract could not have had any possible connection with them or with her services or earnings. The note concerned a matter entirely outside of the statute, and yet it was held that she had capacity to make it and that judgment might be rendered upon it.

In the case of *Wicks v. Mitchell,* 9 Kan. 80, decided at the January, 1872, term, an action was brought on a promissory note executed by a married woman with others, one of whom was her husband. She answered that the note was given in liquidation of the debt of the other makers, and that she signed as surety only. Her answer also contained the following allegations:

"That said note was not given to the plaintiff for the benefit of this defendant, nor for the use and benefit of her sole and separate property, nor with reference to the same, nor for anything which might or could

inure to its or her benefit; that this defendant did not nor has she charged her sole or separate property with the payment of said note, but at the time of its execution refused in any manner so to charge her sole and separate property, or any part thereof." (Page 81.)

A demurrer was sustained to the answer, and judgment given for the plaintiff. This answer went beyond the one made in *Deering v. Boyle,* in that it pleaded the woman's refusal to charge her separate property with the satisfaction of the contract. If the possession of a separate estate which may be bound is necessary in order to confer capacity to contract, the exclusion of such estate from benefit from the transaction and from liability for the satisfaction of the contract ought, it would seem, to be equivalent to the possession of no estate, so far as that contract is concerned. Nevertheless, it was held by this court that Mrs. Wicks had capacity to make the contract, that the answer stated no defense, and that the judgment upon it against her was authorized by law.

In the case of *Larimer v. Kelley,* 10 Kan. 298, decided at the July, 1872, term, it appeared that in 1864 Mrs. Larimer and Mrs. Kelley were captured by the Sioux Indians. They both escaped, and afterward entered into an agreement with each other to write and publish a book describing their experiences during captivity. The expenses of the work were to be borne by Mrs. Larimer, and the profits were to be divided equally. The petition of Mrs. Kelley alleged that when the manuscript was nearly completed Mrs. Larimer took possession of it, carried it to Philadelphia, and had it published in her own name, thereby depriving Mrs. Kelley of the credit and reputation of the authorship of the book and of her share of the profits of its publication. The answer alleged that at the time the agreement was made the defendant was a married woman and had no trade, business or property on her own account, had no earnings from any such trade or

business or from the performance of any labor or serv-
ices, was incapable of making the contract sued upon,
was not authorized to do so by her husband, and that
the plaintiff was also a married woman when the con-
tract was made, and therefore incapacitated to enter
into a binding agreement. A demurrer was sustained
to this answer, and judgment was rendered accord-
ingly.

The contract pleaded was made while the married
women's act of 1859 was still in force. (Comp. Laws
1862, ch. 141; Stat. of Kan. Ter. 1859, ch. 94.) Under
that act, as under the act of 1868 (Gen. Stat. 1868,
ch. 62) which supplanted it, the only express grant of
power to make contracts was that contained in sec-
tion 2, which related exclusively to property. The
points of the argument made in support of Mrs. Lari-
mer's answer are identical with those made in opposi-
tion to the liability of Mrs. Suggs, namely, disability
at common law to contract at all; capacity to contract
now only to the extent to which the common-law disa-
bility has been removed; the letter of the married
women's act, which allows contracts only "with ref-
erence to the same"—that is, in reference to property.
This court, speaking by Mr. Justice Brewer, made
short work of this argument, and announced a capacity
to contract which does not relate to real or personal
property and which is not described in the statute.
In connection with a citation of the statute he said:

"The third and fourth defenses are that a *feme cov-
ert* cannot make a contract such as is set forth in the
petition. That contract is one for labor. Each is to
furnish her skill and knowledge, her time and labor,
in the production of a book. . . . If she can per-
form labor and services on her separate account, she
can contract for them. If she performs them, she can
recover for them. The coverture of the parties did
not therefore avoid their contract, and the demurrer
to the third and fourth defenses was properly sus-
tained." (*Larimer v. Kelley*, 10 Kan. 298, 304.)

In the case of *Tallman v. Jones*, 13 Kan. 438, de-

cided in 1874, a strict and literal interpretation of the statute was rejected, and it was held that a married woman without any separate estate might purchase property on credit for the purpose of engaging in business, and that her note given for such property was a valid obligation.

In the case of *Miner v. Pearson,* 16 Kan. 27, suit was brought to recover upon the note of Louisa B. Pearson and Walter C. Pearson, and to foreclose a mortgage securing it. The district court refused to render a judgment against Louisa B. Pearson on the ground, as counsel stated, that she was a *feme covert.* There is nothing in the case to show that she owned the land or had any separate estate when the note and mortgage were given, or that they were given with reference to any trade or business. This court ordered judgment against her, saying:

"A married woman may in this state bind herself by her contracts to the extent of her separate property. And a personal judgment may be rendered against her which will reach any or all of her separate property not exempt from execution under the exemption laws." (Page 28.)

In the case of *Bolinger v. Brake,* 4 Kan. App. 180, 45 Pac. 950, a married woman had joined in the covenants of a warranty deed of her husband's land. Her capacity to bind herself by such a contract was denied, but both the trial court and the court of appeals held her liable, and the judgment was affirmed by this court. (57 Kan. 663, 47 Pac. 537; 58 Kan. 818, 51 Pac. 290.) Other significant decisions might be adverted to.

This court has been organized some forty-four years, but counsel have cited no decision it has ever made in which any defense based on the common-law doctrine of coverture has been allowed to prevail against a married woman's contract. It is true that in *Deering v. Boyle,* 8 Kan. 525, 12 Am. Rep. 480, and *Wicks v. Mitchell,* 9 Kan. 80, it was said that a married woman

does not bind herself personally as a man does, and that her contracts bind her separate estate or not at all. These statements, however, did not control the decisions rendered, and were soon recognized to be of no special significance. In each case capacity to make a contract which was not and could not be connected with the maker's separate property, trade, business earnings or services was recognized and the contract enforced, and in *Deering v. Boyle* the possession of a separate estate as an element of capacity was utterly ignored.

In *Deering v. Boyle* Mr. Justice Valentine undertook to show that the contract involved did relate to property in a sense sufficient to afford technical authority for it as a strictly statutory affair. He argued that a man contracts with reference to his property without mentioning it. The man makes his contract; the law says what shall be done with his property if he fail to perform. He contracts in view of the law, and thereby relates the contract to his property and binds it. Under the statute a married woman may do as a married man may do, and hence her promissory note given to pay the debt of her husband may be said to refer to her property in its obligation. A man's contract, however, does not refer merely to property in present possession or ownership. Future acquisitions are within its obligation, and the reference of a man's contract to his property may be to such future acquisitions. His contract is that if he do not pay his creditors may sue him, obtain a judgment against him, cause execution to be issued and levied on his property, and cause such property to be sold to satisfy the execution. But he need not have the smallest item or article of property, real or personal, to make the contract, or to make it refer to his property, or to support a judgment upon it. The opinion concludes:

"This is a married man's contract with reference to his property. A married woman may under said section 2 of the married women's act contract 'in the

same manner, to the same extent and with like effect,' with reference to her property." (*Deering v. Boyle,* 8 Kan. 525, 537.)

From the context it is plain that the expression used in that opinion, to the effect that unless a married woman's contract bind her separate estate it is a nullity, referred to the source of satisfaction and not to capacity to contract. The argument is this: A married woman does not bind herself personally—that is, her body cannot be taken on a *capias ad satisfaciendum;* her husband is no longer liable for her debts and he is not bound; therefore, unless she bind her own property the obligation comes to naught.

The same expression was repeated in *Wicks v. Mitchell,* 9 Kan. 80, but the context there also shows that the ineffectiveness referred to does not arise from a lack of capacity altogether prohibiting any kind of an engagement, but that it results from the want of a fund to apply to the satisfaction of a contract entered into by one at all times competent to make it.

"A party is held obligated to do that which is the legal effect of the instrument he executes. The rule is as fixed and clear for married women as for any other persons. When they sign promises to pay, the law holds that they act in good faith, and that they intend to do what they have promised. It considers that instrument a valid instrument, and as it can be held valid only because enforceable against her separate estate it enforces it against such estate." (*Wicks v. Mitchell,* 9 Kan. 80, 89.)

But the potentiality of property which, as the statute contemplates, may come to her by gift, descent, devise, or bequest, or which she may acquire through her own means, or in connection with her own trade or business, is sufficient to authorize the formation of the contractual relation.

From the foregoing it will be observed that there are no restrictions upon the authority of married women to contract generally. Whatever contract her husband can make she can make. The court availed

Harrington v. Lowe.

itself of the first opportunity presented to make this decision, and that the legislative intention was properly grasped is certain from the fact that the married women's act of 1868 has remained unchanged to this day.

The statement in *Deering v. Boyle* and *Wicks v. Mitchell* that a married woman does not bind herself personally was merely a somewhat automatic enunciation of the old law found in all the unregenerated texts. Thus, in Reeve's "The Law of Baron and Femme" it is said:

"It is a general rule that a wife cannot so contract as to bind herself; her contracts are said to be void in law. The principles on which this doctrine is founded are two: (1) The right of the husband to the person of his wife. This is a right guarded by the law with the utmost solicitude; if she could bind herself by her contracts, she would be liable to be arrested, taken in execution, and confined in a prison; and then the husband would be deprived of the company of his wife; which the law will not suffer. (2) The law considers the wife to be in the power of the husband; it would not, therefore, be reasonable that she should be bound by any contract which she makes during the coverture, as it might be the effect of coercion. On the first ground she is privileged for the sake of her husband; on the last, for her own sake." (3d ed., p. 182, *p. 98.)

"No action at law can be maintained against her. For the judgment in that case would subject her person to imprisonment; and thus the husband's right to the person of his wife would be infringed, which the law will not permit in any case of a civil concern." (3d ed., p. 270, *p. 171.)

When the opinions noted were written imprisonment for debt except in cases of fraud already had been abolished, and by virtue of the very statute the court was considering the power of the husband over the wife in the matter of contracts and property had been destroyed. Therefore, as suggested in section 1045 of volume 2 of Cord on Legal and Equitable Rights of Married Women, the reasons assigned for the incapacity of the wife and for her exemption from personal

judgments are destitute of force under our altered and amended law. In recognition of this fact, no doubt, the tone of judicial utterance soon changed, and in *The State v. Hendricks*, 32 Kan. 559, 564, 4 Pac. 1050, the justice who wrote the opinion in *Deering v. Boyle* said:

"In Kansas, women have all the rights and privileges that men have, except merely that they cannot vote at general elections. A married woman may sue and be sued, contract and be contracted with, buy, sell, barter, trade and carry on business in the same manner, to the same extent, with like effect, and as freely as any other person may. And all this she may do in her own name, and in the same manner as others not in her condition."

For all those who feel that the reasoning of *Deering v. Boyle* is artificial, attenuated, and against the overwhelming weight of judicial opinion elsewhere, there is secure ground upon which to declare that the final conclusion reached was sound. The words *feme covert* no longer have for us anything more than a historical interest. The species is extinct in this state. This fact can best be brought into appreciation by standing for a moment with hand on mouth peering into the hole of the pit from whence we were digged.

The common law relating to the rights and powers of married women was based upon a belief in the complete union of the married pair, which would be destroyed by allowing any opportunity for a divided will. It was assumed that conjugal affection would lead the husband to deal justly with his wife, and, if that motive were not sufficiently potent, that a realization of the fact that his wife's interests were identical with his, fear of family discord, pride of appearance and other promptings would move him to eschew all arbitrariness. But it was believed that occasional lapses into despotism might better be suffered than to compromise the indivisibility and indissolubility of the matrimonial union. Hence, to the numerous and respectable audience present at his lectures Blackstone said:

"By marriage the husband and wife are one person

in law; that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs everything; and is therefore called in our law-French a *feme covert, foemina viro cooperta;* is said to be covert-baron, or under the protection and influence of her husband, her baron, or lord; and her condition during her marriage is called her coverture. Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage. (1 Black. Com., Cooley's 3d ed., 441.)

In fact, the woman acquired nothing but a right to support. She was despoiled of all her goods, chattels, and money, which the husband might dispose of as absolutely as if they had always belonged to him, and which he might will away from her at his death. He was entitled to the possession and profits of her land during the marriage, and if he survived her, and a child had been born, the right continued until his death. If she acquired property she could not hold it—it went to him. She could not make a contract or a testamentary disposition of her property, because she had no independent will of her own. The making of a contract with her husband was inconceivable. He was guardian of her children, and was entitled to her earnings and her services. Whatever she did was presumed to be under his coercion. He could restrain her person, and could visit corporal punishment upon her for the purpose of restoring that concord and harmony which marital unity required. If the baron killed his *feme* it was an ordinary kind of homicide. If the *feme* killed her baron it was a species of treason, because she rebelled against the authority and supremacy of her lord, and she was disemboweled and burnt alive.

All this followed naturally, logically and inevitably from the ideal nature of the perfect union, with headship in the husband, which the sacramental ceremony of marriage at the common law established, but it sti-

2—73 KAN.

fled the free growth and expression of that individuality which the laws of nature entitle a woman to display, and it resulted in unconscionable tyranny. Misfortune frequently overtook the matrimonial venture. Wives were reduced to poverty by the conduct of vacuous and profligate husbands. Rapacious creditors knew no distinction between property produced by the impecunious but domineering husband and that which the wife had surrendered when she passed *in manum viri,* and because she was a legal and economic nonentity she was obliged to suffer and submit in abject helplessness.

Courts of equity interposed their cumbersome makeshifts of trusteeships, uses, settlements, and equitable separate estates; but equity follows the law, and unaided it could not overthrow the harsh and stern legal doctrines by which the degradation of married women was accomplished. Finally remedial legislation put in its tardy appearance. In Kansas a beginning was made with the territorial act of 1859, already cited. When the state constitution was framed it commanded the legislature to provide for the protection of the rights of married women in acquiring and possessing property—real, personal, and mixed—separate and apart from their husbands, and for their equal rights in the possession of their children, and created the homestead, which it exempts from forced sale for the payment of debts and which it prohibits the husband from encumbering or alienating without the joint consent of his wife. (Const., art. 15, §§ 6, 9; Gen. Stat. 1901, §§ 232, 235.)

These constitutional provisions themselves irretrievably broke down the common-law theory of marital unity, destroyed the notion of feminine subjection to baronial authority, threw off the restraints of coverture, and installed the modern doctrine of the equality of man and wife before the law. Legislative acts based upon the same principles speedily followed, until not only does a married woman have the right to

Harrington v. Lowe.

acquire, possess and dispose of her own property in her own way, free from her husband's dictation and domination, possess the homestead equally with him and defeat its alienation, if such be her will, make and fulfil contracts for her services, keep her own earnings, conduct her own business and retain the profits, buy from her husband and sell to him as if he were a stranger, sue and be sued, make a will, educate and control her children equally with her spouse, and govern her own conduct free from his interference or restraint, but she is authorized to attend political caucuses and conventions, nominate candidates, vote at municipal and school elections according to her own independent judgment and inclination, and to hold public offices of profit, trust, and honor. What there is left of subjugation by her husband or subjection to him to incapacitate her to make any kind of contract she please is difficult to perceive.

All the legislation affecting the status of married women must be considered in order that the full virtue of each separate act may be appreciated, and it is noteworthy indeed that on the same day the married women's act of 1868 became operative the following statute went into effect:

"The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, shall remain in force in aid of the general statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state; but all such statutes shall be liberally construed to promote their object." (Gen. Stat. 1868, ch. 119, § 3; Gen. Stat. 1901, § 8014.)

The court, therefore, is not obliged to bend its efforts toward the preservation of the swollen autocracy of the baron over the *feme,* but it is at liberty to interpret acts of the legislature from the standpoint of the legislature itself, and according to the remedial purpose it had in view. This purpose clearly appears to involve

a recognition of the fact that the exercise of rights which formerly attended marriage by capture is no longer to be tolerated; that in the family, as elsewhere in society, the finer relations of adult individuals are not fixed by status but flow from uncoerced consent and mutual agreement; that the wants, the interests, the capacities, the activities and the aspirations of a married woman cannot be incorporated and consolidated into those of her husband so that she performs everything under his wing and cover, as Blackstone would have; that the kernel of her life is herself, which conjugal love no more obscures in her than in a man; and that she is entitled to the same untrammeled opportunity for the development and display of her womanhood that he possesses for the development and display of his manhood.

"The tendency in Kansas has always been toward an exact equality among the sexes under the law. The tendency has been to place all adult persons, male and female, upon the same legal plane so far as such a thing can be accomplished." (Mr. Justice Valentine, in *Miller v. Morrison*, 43 Kan. 446, 449, 23 Pac. 612.)

"In Kansas a woman is in nearly all matters accorded civil and political equality with man; she is not his servant nor his slave. Here, the sexes may harmonize in opinion, and cooperate in effort; here, woman is no longer subordinate to man, but the two are coordinate together; here, the burden of a common prejudice and a common ignorance against woman has been wholly removed; here, the tyranny which degrades and crushes the wives and mothers in other countries no longer exists; here, the coveted rewards of life forever forbidden them in some of the states are within their reach; here, a fair field for their genius and industry is open, and womanhood, with the approbation of all, may assert its divinely chartered rights, and fulfil its noblest duties." (Chief Justice Horton, in *The State v. Walker*, 36 Kan. 297, 311, 13 Pac. 279, 59 Am. Rep. 556.)

Therefore the one-person idea of the marriage relation as expounded by the common-law authorities can

no longer be made the touchstone of a married woman's rights or capacities in this state. Her powers and responsibilities do not depend upon the principle of unity, but upon the principle of diversity. True, some adumbrations of the doctrine are shown by our law, and so far as they have become fixed and settled rules must be respected. But coverture is an obsolete relation. It flourished originally in the atmosphere of caste and privilege, and it has gone the way of the *patria potestas* and chattel slavery.

"In this state a husband and wife are two independent persons; and the husband has no more immediate interest or control over the property of the wife than any other person. Our system of marriage literally implies the equality of the husband and wife; the integrity and individuality of each; the mutual obligation in which love and duty find no bondage; the division of labor; and the multiplication and sharing of happiness." (*Baker v. Stewart,* 40 Kan. 442, 459, 19 Pac. 904, 2 L. R. A. 434, 10 Am. St. Rep. 213.)

There is no longer any reason for the common-law doctrine relating to the contracts of married women, and with the death of the reason for it every legal doctrine dies. Reeve applies this test to the case of married women's contracts.

"The true criterion, by which we determine whether she is liable or not upon her contracts, is, whenever the aforesaid marital right [of the husband] can be affected, and whenever we can presume a possibility of coercion, her contracts are utterly void; but if we can find a case when no marital right can be affected, and every presumption of any opposite coercion is removed out of the way, the wife is bound. The words of that distinguished character, Lord Hardwicke, in 1 Ves. 305, are these: 'The disability arising from coverture is not for want of discretion, but because she is under the power of the husband; this position I take to be correct, and the consequence is clear, that when she ceases to be under his power there is no solid objection to her managing her own estate as she chooses, if no marital right is affected by it.' " (Reeve, Bar. & Fem., 3d ed., p. 182, *p. 98.)

This court has had occasion to act upon the same principle:

"The laws of Kansas do not presume that a wife who unites with her husband in the commission of a crime acts under his coercion. On the contrary, the laws of Kansas presume that all persons of mature age and sound mind act upon their own volition, and are responsible for their acts. . . . But, giving this presumption its fullest scope—supposing that it has operation at common law in murder cases, as well as in many others—still we do not think it can have any operation in Kansas; and this on account of the changed condition of our society and institutions. The presumption was probably right, when first adopted, for the state of society which then existed. But it cannot be right now, under our present condition of society. And it is not the law. There was once a reason for the presumption; but that reason has long ago ceased to exist in Kansas; and when the reason for the presumption has ceased to exist the presumption itself must also cease to exist." (*The State v. Hendricks,* 32 Kan. 559, 564, 565, 4 Pac. 1050.)

"Under the provisions of our statute the reasons assigned for the liability of the husband for the torts of his wife no longer hold good, and therefore, in our opinion, under the changes made by the statute the liability no longer exists. It is a part of the common law that, where the reason of the rule fails, the rule fails with it. . . . Again, in this state, the common-law power of correction of the wife by the husband is no longer tolerated. Under the common law the married woman's legal existence was almost entirely ignored. She was sunk into almost absolute nonentity, and rested in almost total disability; but all of this has been changed by the statute, and to-day, in our state, 'her brain and hands and tongue are her own, and she should alone be responsible for slander uttered by herself.' . . . Our conclusion is that the provisions of our statute change the common-law rule, and thereby discharge the husband from liability for the torts of the wife committed when he is not present and with which he has no connection. In this state the wife stands upon an equality, in all respects, with the husband. She is alone responsible for her contracts, and should be alone responsible for her words and her acts." (*Norris v.*

*Corkhill,* 32 Kan. 409, 410, 412, 4 Pac. 862, 49 Am. Rep. 489.)

The conclusion must be that in Kansas coverture affords no ground for declaring invalid a married woman's contract, even although she possess no separate estate or separate trade or business. This being true, the Suggs mortgage is a valid lien upon the real estate in controversy, and the plaintiff is entitled to have it foreclosed.

E. J. Lowe stands upon the proposition that Suggs and wife did not execute or deliver the instrument through which Mason claims title, and she verifies her pleading to this effect. But she alleges that if she should be mistaken the instrument is no more than a mortgage, upon which suit is barred, and hence that the receiver's deed to Green is a nullity as a conveyance of land. Besides, she denies under oath the authority of the receiver to execute and deliver that deed. She is, therefore, thoroughly committed to the position that the title to the land passed to the Suggs heirs upon the death of James Suggs, and she cannot be allowed to assume antagonistic attitudes upon the record. The Suggs heirs could not have taken a valid tax title to their own land. It was their duty to pay their taxes, and a purchase by them from the holder of a tax deed would have amounted to no more than a redemption. The same is true of their grantee, and Lowe acquired nothing by virtue of her acquisition of the Rundle tax title after she had bought out the Suggs heirs.

The district court found that the First National Bank deed was executed and delivered, and did not find that it was a mortgage. It was made subject to the plaintiff's mortgage. The copy in the record shows a consideration of $1000. Soon after its execution and delivery Suggs and wife left the land, and the deed drew to the bank constructive possession. The bank made public claim to the land in its reports to the comptroller of the currency, paid the taxes upon it,

and paid the interest upon the plaintiff's mortgage. Finally it sold the land as its own to one not shown to have possessed any knowledge of the claimed defect, who in turn sold it to the defendant Mason. Under these circumstances James and Malinda Suggs would be estopped to deny, as against the present claimant under that deed, that it was ineffectual as a conveyance. The Suggs heirs would be estopped in the same manner, and their grantee, Lowe, possesses no right superior to theirs to dispute it.

The defendant Rand makes no claim that he acquired a good title to the land or that he was an innocent purchaser. He claims no higher right than those which Lowe possessed and could convey. Lowe cannot plead for him that he purchased innocently, for he holds Lowe's covenants that the title is good in fact.

Lowe acquired title by a quitclaim deed reciting only a nominal consideration. Inquiry at the treasurer's office—one of the public-record offices of the county— would have disclosed the fact that the bank had paid the taxes on the land for a series of years. An inquiry at the bank or of its receiver would have discovered the bank's title. Hence Lowe was not an innocent purchaser, and Rand's title obtained through her altogether fails. The purchase-money mortgage given by Rand likewise fails for want of consideration.

The judgment of the district court is reversed, and the cause is remanded, with instruction to render judgment on the findings of fact in accordance with the views expressed in the foregoing opinion.

All the Justices concurring.