No. 18,522.

J. W. THURSTON, as Executor, etc., *Appellant,* v. FRANK
FRITZ et al., *Appellees.*

SYLLABUS BY THE COURT.

1. DEMURRER—*Court Can Not Weigh Conflicting Evidence.* The
rule that if the evidence demurred to presents a question of
fact for the jury the demurrer should be overruled—followed.

2. DYING DECLARATIONS—*Admissible in Civil Cases.* The rule
that dying declarations are admissible only in criminal cases
(and those involving homicide) is without reasonable basis,
and should not longer be followed.

Appeal from Shawnee district court, division No. 1;
ALSTON W. DANA, judge.   Opinion filed February 7,
1914.   Reversed.

*James A. Troutman, Z. T. Hazen,* and *R. H. Gaw,*
all of Topeka, for the appellant.

*Bennett R. Wheeler,* and *John F. Switzer,* both of
Topeka, for the appellees.

The opinion of the court was delivered by

WEST, J.: At the close of the plaintiff's testimony
the court sustained a demurrer thereto, and this ruling
is assigned as the principal error complained of.   The
action was brought to recover a balance claimed to be
due from the defendants for a tract of land (including
about $300 worth of personal property) formerly
owned by the plaintiff's testator, John Rund, which the
evidence shows was worth from $4500 to $6000.   The
testimony was to the effect that sometime before a
sale was made defendant Beal had a conversation with
Rund about buying the farm and made him an offer,
and a friend advised Rund to sell it for $5000 but he
said he would not, but that Beal had offered him $4500.
Defendant Fritz told various parties that he had
bought the land and had paid $4800 for it.   September

29, 1908, Rund conveyed the land to Fritz, the consideration being expressed as "Five dollars and other valuable consideration." The same day Beal gave Fritz a check for $3000, which the latter deposited and upon the same day gave a check to Rund for the same amount, which he testified was part of the purchase price of the land. October following Fritz and wife conveyed to Beal, the deed expressing the consideration as "Five dollars and other valuable property." In 1909 Rund went to Europe. After his return he was in bad health and had to have the constant care of a nurse. While so situated the defendants visited him at his house, when Rund asked for money. Afterwards the nurse, at his instance, wrote to the defendants to come in and settle, but she did not understand the nature of the desired settlement. Notwithstanding the serious physical condition of Mr. Rund and the severity of the weather, the defendants insisted on taking him from his home out to the country, and on returning the next day to accomplish this were prevented from entering the house by the fact that he had locked it against them. One witness testified that Fritz told him he had bought the farm and would like him to move upon it and work for him, and that he would not have to pay rent; that he, Fritz, did not know how long he would keep it, and that if he did sell the witness would not have to move until spring anyhow. Before this time the witness had been working for Beal, and after moving into the house husked corn on the farm for Beal.

It is the theory of the plaintiff that the deceased had received but a portion of the price of his farm and that the testimony sufficiently tended to show this fact to warrant the submission of the case to the jury. Under the familiar rule it is not necessary that the evidence be such as to warrant a verdict but only sufficient to present to the jury a question of fact. (*Christie v. Barnes*, 33 Kan. 317, 6 Pac. 599; *Farns-*

*worth v. Clarke,* 62 Kan. 264, 62 Pac. 655; *Buoy v. Milling Co.,* 68 Kan. 436, 443, 75 Pac. 466; *Coon v. Railway Co.,* 75 Kan. 282, 89 Pac. 682; *Berry v. Craig,* 76 Kan. 345, 91 Pac. 913.) Men are presumed to intend the natural consequences of their acts, and the peculiar circumstances attending the conveyance of this land, the consideration recited, the statements by one of the defendants of the price paid by him, the anxiety of the deceased to collect money from the defendants together with their apparent desire to get him away from his home and under their control while critically ill are things from which the jury might fairly draw the inference that the defendants still owed part of the purchase price.

A witness was asked how much a certain prospective purchaser whom he had taken to look at the farm offered Mr. Rund therefor, the purpose being to show an offer of $5500. An objection to this testimony was sustained, and this is complained of as excluding evidence to show the value of the land and that Rund had been offered a much larger sum than Fritz said he had paid for it. We find no error in this ruling, however, which had the effect of excluding a matter involving a collateral issue, and having little if any probative force.

Mr. Rund died on the evening of August 21, 1910. The evening before at the hospital he stated that he had been advised by his physician, the nurse and the priest that he could not live long and that he wanted to make a statement before he died. He thereupon dictated and signed in the presence of several witnesses a statement, which was reduced to writing and purported to give the facts of the transaction involved therein, and closed with these words: "I make this statement for the reason that I am very sick and am informed that I can not live long. This statement is my dying declaration and is the truth about the sale of my farm to Mr. Fritz and Mr. Beal." This was of-

fered as evidence and rejected under the well-settled rule holding such declaration incompetent. We are asked to do away with this rule, which it is asserted has no sensible or substantial basis.

The theory on which dying declarations have been admitted is that the realization of impending death operates on the mind and conscience of the declarant with strength equal to that of an ordinary oath administered in a judicial proceeding. After such declarations became classed as hearsay in other cases it was thought better to accept this sort of substitute for a formal oath in homicide cases than to let a guilty manslayer escape. As stated in *The State v. O'Shea*, 60 Kan. 772, 57 Pac. 970, the rule is limited to cases of homicide and is confined to the act of killing and the circumstances immediately attending the act which form a part of the *res gestæ*. In *The State v. Bohan*, 15 Kan. 407, it was said by Chief Justice Kingman:

"Its admission can be justified only on the ground of absolute necessity, growing out of the fact that the murderer by putting the witness, and generally the sole witness, of his crime beyond the power of the court, by killing him, shall not thereby escape the consequences of his crime." (p. 418.)

But in *The State v. Reed*, 53 Kan. 767, 37 Pac. 174, the present chief justice stated that:

"The controlling question is, whether the declarations were uttered under a sense of impending dissolution, and the fact that death did not immediately ensue, or that a hope of recovery was subsequently entertained, will not affect their admissibility." (p. 773.)

And in *The State v. Knoll*, 69 Kan. 767, 77 Pac. 580, the statement was made that:

"The reasons why dying declarations are taken out of the rule which excludes hearsay testimony are those of necessity, joined with the conclusion that a realization by the declarant of the certain and speedy approach of death would be as powerful an incentive on

his part to tell the truth as would the administration of an oath." (p. 770.)

The history of the rule and its application as given by the leading text-writers on evidence shows that at a very early time. it was thought with the fathers of the civil law that one would tell the truth on his death-bed, and for a time dying declarations were admitted in cases both civil and criminal; but later they were confined to cases of homicide, the idea having become prevalent that so exceptional and dangerous a class of evidence should be restricted in its use and application to the "public necessity of preserving the lives of the community by bringing manslayers to justice." (1 Greenleaf on Evidence, 15th ed., § 156.)

It has ever been realized that the party most vitally affected by such declarations is without the means of cross-examination, and it is somewhat curious to observe the readiness with which the courts have concluded that their admission is not in conflict with the constitutional right to meet one's witness face to face. (1 Elliott on Evidence, § 345.) It would seem that the courts first conceived and recognized the sanction which impending death would give to the statement, and that this was rather a predecessor than an exception to the general rule excluding hearsay testimony; that after hearsay had become generally regarded as inadmissible it was reasoned that dying declarations inherently belong in that class, but that as a matter of public policy or necessity their legitimacy should be recognized in homicide cases only. One author informs us that some of the earlier text-writers interpreted the rule as applying to civil as well as criminal cases and the courts upon examination found that such interpretation was incorrect. (1 Elliott on Evidence, § 351.) Another states that up to 1800 no distinction is found between civil and criminal cases or between different kinds of criminal cases. (2 Wigmore on Evidence,

Thurston v. Fritz.

§ 1431.) A writer in the American Law Journal reviewing the history of the matter concludes that up to 1836 in England such declarations were admitted in all cases, civil and criminal, and that the present rule was reached by the decisions of various courts in this country from 1806 to 1874. (1 American Law Journal, p. 366.) The real basis of admissibility, aside from any supposed theory of necessity, is the notion which long ago became a rule of law that the conscious danger of impending death is equivalent to the sanction of an oath. Lord Chief Baron Eyre is credited with the dramatic statement that:

"They are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice." (1 Greenleaf on Evidence, 15th ed., § 156.)

Some have sought to base the change which restricts such evidence to the one class of cases on the fact, disclosed by experience, that some really do not tell the truth even in *articulo mortis,* and hence it is argued that it was deemed safer to exclude such statements except when the exclusion might let a murderer go free. If this was ever seriously deemed the basis of the change it certainly lacked the merit of logic or consistency, for some are not truthful when under the sanction of an oath duly administered, and in no class of cases should doubtful evidence be received more charily than in those involving the life and liberty of the one on trial. And by so much the more should any sort of evidence safe to be admitted in such a case be deemed proper in an action involving mere property rights. Professor Wigmore suggests that:

"The notion that a crime is more worthy the attention of courts than a civil wrong is a traditional relic .

of the days when civil justice was administered in the royal courts as a purchased favor, and criminal prosecutions in the King's name were zealously encouraged because of the fines which they added to the royal revenues. The sanction of a dying declaration is equally efficacious whether it speaks of a murder or a robbery or a fraudulent will; and the necessity being the same the admissibility should be the same." (2 Wigmore on Evidence, § 1436.)

The rule admitting and the rule restricting the declaration, as indicated, are entirely court made, and when the reason for this restriction to cases of homicide ceases, if it ever existed, then such restriction should likewise cease. It might be argued that this common-law doctrine has become so embedded in our judicial system that it should be left untouched. But it was said in *Harrington v. Lowe,* 73 Kan. 1, 84 Pac. 570, that there was no longer any reason for the common-law doctrine relating to the contracts of married women, "and with the death of the reason for it every legal doctrine dies." (p. 21.)

In *McFarland v. Shaw,* 4 N. Car., 2d ed., 200, 2 N. Car. Law Repos. 102, the supreme court of North Carolina decided that in an action by a father for the seduction of his daughter he could give in evidence her dying declaration charging the defendant with having been her seducer. It was said that the decision was confined to the facts presented, but in holding the evidence competent the court used this language:

"In cases where life is at stake, such evidence is uniformly received and credited, and numerous are the victims to its authority, recorded in the mournful annals of human depravity. Can the practice of receiving it to destroy life, and rejecting it where a compensation is sought for a civil injury, derive any sanction from reason, justice, or analogy?" (p. 203.)

The supreme court of Georgia, in criticizing this holding as contrary to the whole current of authority, said:

"We will not say that there is not, perhaps, as much reason for admitting the evidence in a case like this as in one of a homicide." (*Wooten v. Wilkins*, 39 Ga. 223, 225.)

In *Barfield v. Britt*, 47 N. Car. 41, the decision in *McFarland v. Shaw* was repudiated. It was said the holding had manifestly been made under the impression then generally prevalent that dying declarations were admissible under the rule stated by Lord Chief Baron Eyre, and that if it stood upon the general principle alone "it might well have been contended, as it was contended, that dying declarations ought to be admitted in all cases, civil as well as criminal." (p. 43.) But the court deemed the lack of opportunity for cross-examination the reason for restricting such declarations to criminal homicide cases, a view for which we do not find much reason or authority.

We are confronted with a restrictive rule of evidence commendable only for its age, its respectability resting solely upon a habit of judicial recognition, formed without reason and continued without justification. The fact that the reason for a given rule perished long ago is no just excuse for refusing now to declare the rule itself abrogated, but rather the greater justification for so declaring; and if no reason ever existed, that fact furnishes additional justification.

The doctrine of *stare decisis* does not preclude a departure from precedent established by a series of decisions clearly erroneous, unless property complications have resulted and a reversal would work a greater injury and injustice than would ensue by following the rule. (11 Cyc. 749.) The tendency is towards the reception rather than the rejection of evidence, experience having shown that more harm results from its exclusion than from its admission. (*Fish v. Poor-*

*man,* 85 Kan. 237, 243, 116 Pac. 898; 1 Wigmore on Evidence, § 578.)    We hold that the declaration is competent, and upon another trial should be admitted.

The ruling sustaining the demurrer is reversed and the cause is remanded for further proceedings.

BENSON, J. (dissenting) :  The rule that dying declarations are only admissible where the death of the declarant is the subject of the investigation is settled as firmly in the jurisprudence of this state as any rule can be which is not established by constitution or statute.

Conceding that the rule should be changed, there is one obvious reason, without referring to others, why the legislature and not the court should make it.

There is a statute, long in force, which prohibits a party from testifying in his own behalf to a communication with a person since deceased where the adverse party is the personal representative or heir at law or assignee of the deceased person.  The voice of one being stilled by death, the silence of the other is enforced by law, thus promoting that equality which is justice. Under this decision the voice of the dead may now be heard, but that of the living is still silenced, for this court is powerless to amend or repeal the statute.

This situation illustrates the wisdom of leaving to the legislature its appointed task of lawmaking.  It has adequate power to modify or abrogate the rule concerning dying declarations when in its wisdom such action shall be thought expedient, and at the same time preserve the equal rights of the parties in court by amending or repealing the statute above referred to, without which justice will doubtless be defeated in many cases.

Professor Wigmore, after a careful review of the decisions, including those of this state, concludes that the limitations upon the admission of dying declarations do not rest upon sound principles.  But his recom-

Kemp v. Railway Co.

mendation is that they be abolished by legislation. (2 Wigmore on Evidence, § 1436.)   It is dangerous to abolish them otherwise.

I dissent from that part of the opinion which over-throws the rule of common law and the decisions of this court concerning dying declarations.