No. 25,412.

ANNA F. WOHLFORT, *Appellee*, v. AXEL T. WOHLFORT, *Appellant*.

SYLLABUS BY THE COURT.

1. CONTEMPT—*Action for Separate Maintenance by Wife—Abandonment for Less Than One Year.* When a husband abandons his wife without just cause, she may maintain a suit for separate maintenance, though the abandonment has not been for a period sufficient to constitute a cause for divorce.

2. SAME—*Refusal to Obey Order for Temporary Alimony—Under the Facts an Order for Commitment for Contempt Was Erroneous.* In a suit for separate maintenance, the court made an order for the defendant to pay a specified sum for temporary alimony and suit money by a day certain. Upon a hearing for contempt for nonpayment it was shown that defendant had property which, if sold, would bring enough, or nearly enough, to pay the sum due. Defendant offered to sell the property, or permit it to be sold, for that purpose. *Held,* it was error to commit him for contempt until

the sum was paid. The property should have been sold, under order of the court if necessary, and the proceeds applied upon the sum due.

3. SAME—*Duty of Husband to Make Reasonable Provision for Maintenance of His Wife.* It is the duty of a husband to make reasonable provision from his money, property, or labor, for the maintenance of his wife, and he is not relieved of that duty by the fact that the wife, without fault on her part, is compelled to live apart from him.

4. SAME—*In a Proper Case a Husband May Be Committed for Contempt for Refusal to Provide Maintenance for His Wife.* The court may, in a proper case, commit a husband for his refusal to provide maintenance for his wife, even though to do so requires him to labor.

Appeal from Republic district court; JOHN C. HOGIN, judge. Opinion filed May 10, 1924. Reversed.

*Park B. Pulsifer,* and *Clyde L. Short,* both of Concordia,, for the appellant.

*H. H. Van Natta, W. D. Vance,* and *R. E. McTaggart,* all of Belleville, for the appellee. .

The opinion of the court was delivered by

HARVEY, J.: This is an appeal from a judgment of contempt for refusal to pay a specified sum for temporary alimony and suit money in an action for separate maintenance. The records show the facts to be substantially as follows: The plaintiff, Anna F. Wohlfort, and the defendant, Axel T. Wohlfort, were married in 1911. Prior thereto plaintiff had lived in Chicago and had been employed as cashier in one of the stores, and defendant had lived with his parents on a farm near Scandia. They had no property. Defendant's parents furnished the home, gave them some stock, furnished them credit by which they procured horses and farming implements and permitted them to occupy a 280-acre farm owned by defendant's mother. Defendant's father died in 1916 and by will left all of his property to his widow and a daughter, the mother and sister of defendant. Plaintiff and defendant lived upon the farm from the time of their marriage until May, 1922, when they sold most of their live stock and farm implements and moved to Chicago. Their farming operations had not been very successful and after they left defendant's mother paid various of their debts amounting to about $1,300. They rented a rooming house in Chicago, bought some furniture, giving their note for about $240 in part payment, which note defendant's mother later paid. Plaintiff undertook to look after the rooming house but in October, 1922, she was compelled to go to the hospital for about three weeks for an

operation. The expense of that, amounting to about $500, was paid by defendant's mother. Before going to Chicago defendant had never done anything but farm work, but he was handy with carpenter tools and expected to get employment as a carpenter. He did get some employment of that kind, but either because of the lack of skill in the trade, or the fact that he did not belong to the Union, or both, he was unable to get steady employment or good wages. He undertook to join the Union but his application was denied. Being unable to retain sufficient employment to provide for himself and wife, about December 15, 1922, defendant went to Topeka, where he had a sister living, with a view of finding employment and sending for plaintiff. At that time plaintiff, though not fully restored to health, was able to look after the rooming house, some rooms of which were occupied and some vacant. They had no debts in Chicago. Their small bank account was in plaintiff's name and out of it she gave defendant $15 to make the trip to Topeka. Defendant remained in Topeka some two or three months, then went to the home of his mother near Scandia, where he has since lived. He has had no employment since he left Chicago and did not send for plaintiff. After leaving Chicago he and plaintiff corresponded for a while at least, but the nature and extent of that is not shown by the record. The plaintiff remained in Chicago until some time the next summer, when she sold the used automobile and what furniture they had for about $250 and used the money in paying her expenses. She went to Scandia and filed this suit in September, 1923, and alleged as her ground of action that defendant had been guilty of extreme cruelty and gross neglect of his duty toward plaintiff, and specifically that he had, without just cause, abandoned her in December, 1922, at a time when her health was not good and that he had wholly failed to provide for her since that time. The petition also described certain personal property owned by the parties which had not been sold when they went to Chicago, and set up a claim that defendant has an undivided one-sixth interest, worth $30,000, in the estate of his father as though a will had not been made, which the petition avers arose because of the fact that defendant's father died in November, 1916; that his will was not probated until March, 1923, and during all that time the will was in the possession and under the control of the devisees named therein. Defendant's mother and sister were made parties and have filed a demurrer to the petition which has

not been ruled upon. Soon after filing the petition plaintiff made application for temporary alimony and expense money. Upon hearing of this motion October 16, the defendant was in court, though not represented by counsel. The court made an order that the defendant pay $50 for plaintiff, $50 for her attorneys and $75 for suit money by November 1. This not being paid on November 5, proceedings for contempt were instituted and a hearing thereon was had November 14. The accusation for contempt set out the order of the court making the allowance, and that the defendant had failed to pay any part thereof, and averred that he was physically and financially able to comply with the order. Defendant in his answer to the accusation denied his financial ability to comply with the order and averred that defendant had not contemptuously refused to obey the order, but that he had not paid the same for the reason that he was unable to do so; that he had no property except a small amount of specific personal property, which he described, which he alleged he had offered and still offered to sell or have sold, and the proceeds applied pursuant to such orders as the court may direct, and averred that he had no employment, and had had none for several months.

On the hearing as to defendant's ability to pay, the plaintiff testified, when they went to Chicago they left a team of mules, a mare, a cow, two calves and some farm machinery on the place, and that defendant left with his mother for safe-keeping some gold pieces which she thought were worth $50 to $60; that defendant had been working some on his mother's place since he came from Chicago, but she did not know what pay, if any, he was receiving; that there was corn husking and other work in the neighborhood which defendant could get to do and was capable of doing and which paid good wages, and further, she claimed that the defendant had an undivided one-sixth of his father's estate and that her attorneys had brought, or soon would bring, an action to determine that matter. On behalf of the defendant he admitted that he had the two mules and mare, but said all of them were old, worth very little, practically nonsalable; that the farm machinery was old machinery which he could not sell when he went to Chicago, was of little value and practically unsalable. That the cow, two two-year-olds and a calf, were salable and were worth about $100, and that he had left with his mother when he went to Chicago, gold pieces of the value of $26. He expressed his willingness to convert

this property into cash and pay it to the court for plaintiff. He said he was living with his mother and sister on the farm, doing a little work about the place for his board and living expenses. That he had no employment and had earned no money since leaving Chicago, though he had endeavored to get employment; that corn husking had been on only about two weeks but he had not attempted to get work at that, and that he had no property other than that above described. His testimony was corroborated by that of his mother and sister. At the time of the hearing he was forty-three years of age and in good health. The court found, "Defendant is guilty of willful contempt as charged and that he should pay the costs incident to the proceedings in contempt," and ordered that he be confined to the county jail "until such time as he purges himself of such contempt by making full compliance with the order of the court made on October 16, 1923, as far as is complained of in the charges of contempt herein filed, and by further payment of the costs of this contempt proceeding." He appeals from this order and contends, first, that no order of temporary alimony or expense money should have been made, and that defendant should not be punished for violating such order, for the reason that the petition filed by the plaintiff does not state a cause of action. The point made is that under R. S. 60-1516 an action for separate maintenance can be maintained upon the same grounds only as can an action for divorce. It is contended that the only ground charged is abandonment and that this was for less than a year, hence it would not constitute a ground for divorce, nor for suit for separate maintenance. While the abstract does not show that this question was specifically called to the attention of the court, when an application is made for alimony *pendente lite* in an action for divorce or for separate maintenance, though the merits of the action are not involved further than to see that plaintiff is prosecuting the case in good faith, the court should look at the petition enough to know that it states a cause of action. (*Litowich v. Litowich,* 19 Kan. 451, syl. ¶ 3.) The petition alleged extreme cruelty and gross neglect of duty without detailing facts upon which the allegations were based. It was subject to a motion to make more definite and certain (*Callen v. Callen,* 44 Kan. 370, 24 Pac. 360), but no such motion was made; neither was a demurrer filed by this appellant. No reason suggests itself why the defendant in such an action, if he desired to do so, might not waive the lack of specific allegations

of facts upon which were based the charges of gross neglect of duty and extreme cruelty. (*Laithe v. McDonald,* 7 Kan. 254.) But, passing that and treating the petition as alleging as an only ground for relief abandonment for less than one year, it is still sufficient to support a cause of action for separate maintenance. The statute reads:

"The wife may obtain alimony from the husband without a divorce, in an action brought for that purpose in the district court, for any of the causes for which a divorce may be granted. . . . " (R. S. 60-1516.)

It will be noted that the statute makes cause for divorce available as the basis for an action for separate maintenance, but does not limit such an action to such causes. Separate maintenance will be granted when a. cause for divorce is alleged and shown, but the duty of a husband to suport his wife is continuous, and if he abandons her, she does not have to wait a year until the abandonment has ripened into a cause for divorce, before she can maintain an action for separate maintenance. It would be a peculiar hiatus in the law, to hold that a partial failure of marital duty (*Smith v. Smith,* 22 Kan. 699), amounting to gross neglect of duty, would support such an action at once, but that a total failure of such duties would not support such an action unless total failure had continued for a year. Fortunately, no such hiatus exists.

In 30 C. J. 1073, dealing with the period of desertion necessary to maintain an action for separate maintenance, it is said:

"Not only in jurisdictions where grounds for divorce need not be shown, but even in jurisdictions where such grounds must appear, in order to entitle the wife to an allowance for separate maintenance, she may commence an action·for separate maintenance on the ground of desertion at any time after the desertion occurs, even though it has not continued for the period of time required by statute in order to constitute a ground for divorce." (See cases there cited; also, *Brady v. Brady,* 144 Ala. 414; *State v. District Court,* 220 Pac. 88 [Mont.]; *Clifton v. Clifton,* 83 W. Va. 149; *Tehsman v. Tehsman,* 93 N. J. Eq. 422.)

In the article on alimony in Ruling Case Law, after noting the practice of the ecclesiastical courts in suits for separate maintenance, and noting that the early decisions in this country were to the effect that courts of equity had no jurisdiction to award alimony except as incidental to suit for divorce, which view is still maintained in some jurisdictions, it is said:

"The weight of authority, however, has shifted, and in a very decided majority of the states it is now the settled rule that the jurisdiction of the

equity courts to award alimony is not merely incidental to suits for divorce, or separation, but is inherent, and that alimony may be awarded in an independent suit therefor." (1 R. C. L. 878.)

And at page 881:

"It has been argued that to grant alimony in an independent suit is equivalent to granting a divorce from bed and board, as it necessitates a determination of the question whether the wife has good cause for living separate from her husband; and that consequently, if a court lacks jurisdiction to decree a separation, jurisdiction to decide that question must also be wanting. The fallacy of this argument lies in the assumption that authority to pass upon the wife's right to a separate maintenance is dependent upon jurisdiction over the subject of divorce. . . . Consequently there is no logical basis for the objection that jurisdiction to award alimony in an independent suit is dependent upon jurisdiction over the subject of divorce."

Appellant contends that the order committing him to jail for failure to pay the $175 he had been ordered to pay November 1, was wrongful for the reason that the evidence showed that he was financially unable to pay the same. In determining this we shall not consider plaintiff's claim that defendant is entitled to an undivided one-sixth interest in his father's estate for the reason that that was not established nor attempted to be established upon the hearing for contempt and it was not considered by the trial court. The only property owned by the defendant at the time of the hearing was two mules and a mare, all old, a few pieces of old farm machinery, a cow and calf and two coming two-year-olds and $26 worth of gold pieces. The value plaintiff put upon all of this property was about $200 and defendant valued it at about $125. In his response to the accusation for contempt and in his testimony, defendant offered to sell all of this or permit it to be sold, to apply upon the court's order for the benefit of his wife. This should have been done before commitment to jail. If necessary, the court might have ordered it sold by the sheriff and the proceeds applied upon the payment then due and it might have been sufficient to pay the full amount and certainly would have paid a substantial part of it. As we speak of the term "temporary alimony" it is an allowance made to the wife for her maintenance pending the litigation and to enable her properly to prepare her case, and is ordinarily made out of the property of the husband or the joint property of the parties, the title or possession of which is in the husband, or out of the earnings of the husband if he be employed. The amount of it should be determined by the needs of the wife and the ability of

the husband to pay. While the court has power to commit one for failure to comply with an order for the payment of temporary alimony, the commitment should not be issued in any case unless the refusal is contumacious, and that cannot be said when the husband is willing to turn over to his wife or to be sold for her benefit all the property and money he has. (*State v. Dent*, 29 Kan. 416; *Cooper v. Cooper*, 115 Kan. 500, 223 Pac. 317.)

Another question is argued. Does the court have authority to compel a husband to work and earn money to pay temporary alimony and to commit him to jail if he does not do so? This question was argued in *Barton v. Barton*, 99 Kan. 727, 163 Pac. 179, but it was not necessary there to decide it. Possibly it is not necessary to decide it here so far as the contempt proceedings now before us are concerned, for appellant's property if sold and applied may pay the sum which precipitated this proceeding. But since counsel for both sides have argued it and since it appears imminent because of subsequent accusations for the failure to make the monthly payments since due and may be important in the proceedings before us, we shall dispose of it. Looking to the decisions, there appears to be a decided conflict in the holdings of the courts. The extreme views are illustrated by *Messervy v. Messervy*, 85 S. C. 189, 192, which holds the court cannot "compel a husband, who has no trade or profession or employment, to learn a trade, acquire a profession, or find employment, and by the exercise thereof, derive an income" to comply with the court's order to pay alimony to his wife in a suit for her separate maintenance. And by *Fowler v. Fowler*, 61 Okla. 280, which holds:

"A man who has no money or tangible property may be punished for contempt of court in failing to pay alimony adjudged to be paid by him, if he makes no honest effort, considering his physical and mental capabilities, to work and earn money to pay the same."

The Messervy case is reported with extensive notes in 30 L. R. A., n. s., 1001, 1003, where it was said:

"The rule . . . that the courts cannot compel a man to work to earn alimony, does not seem to be questioned anywhere, but its application seems to have been attended with difficulty in some of the earlier cases."

It is also reported with extensive annotations in 137 Am. St. Rep. 873, where it was said:

"While the extraordinary power of personal attachment is conceded to rest in the courts, it is nevertheless subject to the limitation—as a rule the con-

stitutional limitation—that a party may not be imprisoned except in those cases in which it shall appear he has the pecuniary ability to enable him to comply with the decree, and his disobedience is willful. The court is empowered to punish willful obstinacy, in such cases, by imprisonment, but the spirit of the constitution forbids that the pecuniary inability of the party, not resulting from his fraudulent conduct to produce that condition, cannot be punished as a contempt by imprisonment." (p. 883.)

It is also the authority for the text in 1 R. C. L. 919:

"Of course if, through no fault of his own, the husband is actually unable to pay the allowance, the court cannot compel him to work and earn money in order to comply with the award, nor can it punish him for contempt for refusing to do so."

The Fowler case criticizes the reasoning of the Messervy case and is based upon the primary duty of the husband to maintain his wife, which does not depend alone upon his having visible property, but includes his ability to earn money by his exertions, and places willful refusal to work when the party is capable of doing so, and work is available, upon the same basis as willful refusal to pay money when the party has money with which to pay. It is reported in L. R. A. 1917C 89, with annotations, which notes the disagreement with the Messervy and other like cases. In 19 C. J. 304, the rule is thus stated:

"It is generally held that in order for the husband to be guilty of contempt the refusal to pay alimony must be willful, amounting, as it has been said, to 'contemptuous disobedience,' and that attachment is not properly granted where the defendant is *bona fide* unable to pay, but is where it appears that his inability was occasioned by his own act for the purpose of avoiding payment. . . . Some cases hold that a court cannot by attachment compel a delinquent husband to seek employment, or to change his occupation, and thus derive the means to pay alimony (citing Messervy and other cases); but there is good authority to the contrary (citing the Fowler case); and it has been held that an order directing a husband to pay monthly alimony or be confined for contempt will not be disturbed because his only means of acquiring money is by his labor."

Later authorities are *Brady v. Brady,* 144 Ala. 414; *Muse v. Muse,* 84 N. C. 35; *Smith v. Smith,* 154 Ga. 702; *Morden v. Morden,* 119 Wash. 176; *Pinkinson v. Pinkinson,* 93 N. J. Eq. 583; *Lightfoot v. Lightfoot,* 149 Ga. 213; *Harmon v. Harmon,* 152 Ark. 129.

But this conflict of authority is much more apparent than real. It would prolong this opinion beyond reasonable bounds to undertake to analyze all the cases bearing upon this question. He who cares to do so may readily find them from the above citations.

The fundamental principles running through them may be thus

stated: The marriage relation creates and imposes upon the husband the duty and obligation to support his wife; not necessarily in idleness; it is the duty of both to use their ability and energy to aid and promote their common comfort and prosperity. This duty of the husband is not limited by his property alone but includes his ability to work at some useful vocation; in fact, many homes are supported wholly by the labors of the parties, and primarily by the earning capacity of the husband. This duty of the husband to provide for his wife does not cease when she is compelled to live apart from him through no fault of her own, but continues as long as the marriage relation continues. It is uniformly held that in making allowances for temporary alimony in suits for separate maintenance, it is proper for the court to take into consideration and make his allowance based upon the earning capacity of the husband, and especially if his property is inadequate for the purpose. The amount of the allowance depends upon the needs of the wife and the ability of the husband to pay, and in determining that ability the extent of his property and his ability to earn money may properly be considered. It does not necessarily follow that if the wife needs or could conveniently use $50 or $100 per month for her maintenance that the husband is required to pay that sum; the parties have taken each other for better or for worse, and if his lack of financial resources and his lack of ability to earn is such that he cannot pay more than $10 or $20 per month he should not be required to pay more. An allowance of temporary alimony based upon these considerations is not a debt within the meaning of the constitutional provision prohibiting imprisonment for debt. In such a case, when the court makes a reasonable order the amount of which the husband can pay out of his property or out of his earnings, the court has the power to commit him to jail for contempt if he willfully refuses to do so. But an order committing to jail is the exercise of the ultimate power of a court of equity, and the prudent chancellor is careful that there be no mistake in its use. It should be used only when it is clear (1) that the original order is reasonable, (2) that the husband is able to comply with it without undue hardship, and (3) that his refusal to comply with it is willful to such a degree as to be contumacious, amounting to contemptuous disobedience. When this situation is made clear, then the chancellor not only has the power, but it becomes his duty to issue the commitment. The form of the commitment may be important. If the husband has the amount of money he has been ordered to pay and

contemptuously disobeys the order, his commitment should be until he pay, for in that case he has the means to obtain his own release; by making the payment the jail is unlocked to him. If he does not have the money, and has no property which he can readily convert into money, it is obviously improper to commit him until the money is paid. Such a commitment under those circumstances would be indefinite imprisonment, from which the husband could never release himself. It would not be proper to hold him in jail until the sheriff or some one could find him, say a day's work on the road, then let him out to work that day, his earnings to be paid to the wife, then take him back to jail until another day's work or week's work could be found. Such a procedure would amount to involuntary servitude, without conviction for crime, and would be in effect an imprisonment for debt, in violation of the spirit, at least, of both our federal and our state constitutions. But, as we have previously observed, the fact that the husband does not have money, or property, does not relieve him of his marital duty to provide for his wife. If he is capable of performing physical or mental labor, and such work as he is capable of doing is available to him, by the doing of which he can earn money to maintain his wife, and where this is clear, and it further clearly appears his refusal is willful, to such a degree as to be contumacious, amounting to contemptuous disobedience, not only of his marital obligations, but of reasonable orders of the court, then the chancellor has power and it becomes his duty to issue the commitment. In such a case the commitment should not be until a specific sum is paid, but it should be until the husband purges himself of contempt by expressing in good faith a willingness to do what he reasonably can do to earn money to maintain his wife. Under such a commitment the husband has within his own breast the key for his release from prison, and his imprisonment is not involuntary.

Appellant complains that the amount which by the court's order he is required to pay, especially the monthly payments of $50 each, is more than it is possible for him to pay in any event. While it seems there is some merit in this contention, the evidence on that question is not sufficiently complete for us to say what he can pay. It can be best reached by a motion to modify the amount.

The judgment of commitment will be reversed with directions that the property of appellant be sold and the proceeds applied in accordance with the court's order and that the further proceedings in the cause be taken in accordance with this opinion.