85 P.2d 743

**ANDREWS v. McMAHAN.**

No. 4392.

Supreme Court of New Mexico.

Dec. 20, 1938.

Edward D. Tittmann, of Hillsboro, for appellant.

R. R. Posey, of Las Cruces, for appellee.

HUDSPETH, Chief Justice.

The appellant married in the year 1926 at the age of seventeen and was divorced in Oct., 1931. The custody of an only child was awarded to its mother, appellee, who married Andrews, her present husband, three years later. Appellant by the decree of divorce was ordered to pay the mother $15 per month toward the support of the child and $100 attorney's fee. Nothing has been paid. The present proceeding was commenced by an application for an order to show cause filed Dec. 4, 1937, by Martha Andrews, mother of the child and former wife of appellant. Appellant answered that he at the time the decree was entered, and ever since that time, has been and now is in ill health and unable to do physical labor; that he has no special knowledge or skill to enable him to earn a living; and that he is not qualified so far as knowledge is concerned to hold any job beyond common day labor; that by reason of his infirmities he is physically unable to perform day labor; that at all times since said decree herein he has been supported by his relatives; that he has no property nor at any time has he had property or means with which he can or could provide for himself or anybody or his dependents; that if it were not for the aid of relatives he would be on relief. Appellant had an operation for prostate gland trouble and later had ulcers of the stomach, but was recovering from the last illness, according to the testimony of his doctor, at the time of the hearing. The court found that he could have done manual labor part of the time since the decree was entered; that while he could not perform specialized clerical work like bookkeeping or stenography he had sufficient strength at nearly all times to have performed other work like timekeeping, salesman in a store, waiter in a restaurant, and the like; "that while on one or two occasions he may have sought employment, his disposition has not been to make repeated or sustained efforts to do so; that if he had been disposed he could have paid something under the decree, however small such payments may have been; that especially could he have done so since the enterprise, in which he and his present wife are engaged in at Goldsmith, Texas, has been earning an average of $150.00 per month, which enterprise was set up and money advanced therefor, for the benefit of the defendant, as well as for the benefit of his present wife."

The court found and adjudged appellant in contempt and sentenced him to jail as follows: "The court will, therefore, and hereby does, find and adjudge that the defendant is in contempt of court, and it will be and is the order and sentence of the court that he be committed to jail for a period of sixty days, subject to being liberated from jail at any time prior to the expiration of the sixty days upon full compliance to date on his part of the terms of the decree requiring him to pay support money for his child; to which judgment and sentence defendant excepts."

Appellant married his present wife Jan. 10, 1937. It appears without dispute that

wife number two borrowed the $2,000 with which the Goldsmith, Texas, enterprise was started and that the title to the property is in her name. The finding of the court with reference to the establishment of that enterprise is based upon evidence only in the sense that the father of appellant loaned the money to appellant's wife in the hope or expectation that the wife would relieve him of the burden of supporting his son. The father of appellant testified with reference to the nature of the transaction as follows: "Well, the arrangement was this: She thought she could go into a little business down in Texas, and maybe get by, and she come to me to borrow some money, and I loaned it to her; a thousand dollars at one time and five hundred dollars twice."

This witness also testified that he has paid all the attorneys' fees of his son throughout the litigation between appellant and complainant. He further testified as follows:

"Q. Ever since this young lady, Martha, and your son Mark were divorced who has supported Mark? A. I have.

"Q. Do you know whether he has had any position since then in which he earned any money whatever, and if so state what: A. I don't remember of anything. If there was any job it was for a short time. Nothing to make me remember it.

"Q. During the time since the divorce between Martha Andrews and Mark, who paid, if you know, for the doctor bills of Mark? A. I paid it.

"Q. Mr. McMahan, apparently they have spent a good deal of your money? A. They sure did, yes, sir.

"Q. Why did you pay those bills—because Mark didn't have the money? A. Mark didn't have the money. If Mark had had the money I would have let him pay his own bills.

"Q. Why didn't he have it; was he too young at that time to earn money? A. Yes was young, yes. He married when he was seventeen years old, and he never earned no money before that, and very little he has earned since."

The appellant testified:

"Q. You never have earned any money in all your life? A. No, sir, not to speak of.

"Q. How old are you? A. Twenty-eight.

"Q. Your not earning any money is that due to the fact you couldn't find work, or didn't want work, or due to your health? A. I have tried to get a job to see if I could work during the depression and couldn't find work. I wanted to see if I could work."

The court on cross examination interrogated the appellant as follows:

"How did you happen to get married this second time? A. How did I?

"Q. I mean by that, you are a grown man, and should have a sense of responsibility, and you know that a man should support his wife. Were you prepared to support your wife when you married the

second time? A. No, sir, I wasn't at that time.

"Q. Did she know it? A. Yes, sir.

"Q. Is there any feeling of moral responsibility on your part to support this boy? Do you think you should? A. Yes, sir, I do feel I should. They won't let me see him or have him. I could have got support from my mother if they had done me right about it. They told me they would, but they wouldn't as long as they wouldn't let me see him.

"Q. What do you mean by that, because they wouldn't let you come to see him that you didn't feel you were obligated to support him? A. That is what they figured.

"Q. What did you figure? A. I couldn't do otherwise, I didn't have nothing.

"Q. Did you ever apply to your parents to give you any assistance for this child? A. My mother has bought him stuff.

"Q. Did you ever apply to your father to let you have money to assist in supporting this boy? A. They told me they would help me support him if they would only let him come to see them, or let me see him, not teach him to run from me and hate me.

"Q. With those conditions, and if it would be true that they wouldn't let him come out to see you, and you couldn't see the child, have you ever made any attempt with that in mind to get them to assist you in any way to help support this child? A. They had already told me what they would do.

"Q. They could have given you something for the support of this child if they had wanted to? A. I suppose they could have.

"Q. But you never made any strong effort to get them to help you in that respect? A. I have asked them to.

"Q. How often? A. Two or three times. They said they wouldn't support him so long as the Hiett's aimed to keep him, and wouldn't let them see him. If they was that contrary they would be contrary too.

"Q. Mark, you say that your present wife knew that you was not physically able to support her, did you tell her so? A. I told her I was not able to work.

"Q. What did she say? A. She said we could get by some way."

■ This is a typical case of the parent having custody of the child poisoning its mind against the relatives of the other blood. The child was registered in school under the maiden name of its mother. He was not permitted to visit the paternal grandparents who, it appears, have property. Under the facts in this case there is neither financial nor moral obligation on their part to contribute to the support of their grandchild. Nor does the second wife, when she knowingly takes on the responsibility of supporting a trifling or worthless husband, assume his financial obligations growing out of a former marriage. The appellant is without money, property or credit. He has no demonstrated earning capacity.

Therefore he is not able to borrow if borrowing is embraced in his obligation. The suggestion of counsel that a jail sentence might cause relatives to pay the arrears on the judgment, amounting to more than $1,100, does not appeal to us as the proper view. Holcomb v. Holcomb, 53 Wash. 611, 102 P. 653, 654. It partakes of the nature of holding hostage for ransom or the buying out of bondage. It is a form of punishment of kinsmen for the fault of the delinquent. History furnishes many examples of these practices, and in fact something of this nature is being employed in Europe today, but we have not been cited to American authority commending such practice.

Some courts have commented upon the consideration which should be given to the second marriage of defendants in cases of this sort. In Fjeld v. Fjeld, 201 Minn. 512, 277 N.W. 203, the court said [page 204]: "He assumed additional burdens by remarriage. While it was within his rights to remarry, he could not, in good faith, ask his former wife and his children to share the newly assumed burdens. * * *" This case seems not to fall in that class. While technically the husband assumes a burden of supporting his wife when he marries, the court brought out in the examination of appellant the fact that he informed his prospective wife that he was unable to work and it was she who assumed the burden.

We are inclined to take the findings of the trial court as to the appellant's physical condition, past and present, as binding on us. The evidence was conflicting. He had the appellant before him and could to an extent judge of the state of his health by sight. The court in Redding v. Redding, 167 Miss. 780, 150 So. 776, after commenting on the advisability of a defendant who is physically unfit to work making that fact known to the court by proper petition and have the alimony decree modified or suspended and not wait until he has been cited for contempt, said: "* * * this for the reason, among others, that chancellors who have been long on the bench learn that decrees for alimony are notably productive of pretenses of poor health and inability to work, and on citations for contempt they are authorized to scrutinize such excuses in the light of that judicial experience. * * *"

The judgment of the trial court is presumed to be right and must stand until reversible error has been shown, although the orders of the trial court are not conclusive, it being for the supreme court, having due regard to the findings of the lower court, to say whether the facts establish contempt. Roach v. Oliver, 215 Iowa 800, 244 N.W. 899. In the case of Mery v. Superior Court in and for Alameda County, 9 Cal.2d 379, 70 P.2d 932, the Supreme Court of California states [page 933]: "Here the petitioner was charged with contempt for failure to pay the accrued sum of $2,000 with no statement of facts showing his ability to pay other than that he 'is employed.' He was not cited to defend the claim that his veterans' bonus was subject

to execution to pay this pre-existing debt, nor the claim that, because his second wife was employed, he should look to her alone for his support and use his own wages in payment of the alimony judgment, nor with the claim that an automobile used by him should be dispensed with. He was cited to show why he should not be punished for contempt for the failure to pay the accrued sum of $2,000 and not merely a part of that sum, and the only allegation upon which that citation was based was that he was able to pay that sum because he 'is employed.' This falls far short of a statement of facts showing that a contempt has been committed, particularly a contempt justifying the order of commitment which the respondent court threatens to make."

In Wheeler v. Wheeler, 252 App.Div. 673, 300 N.Y.S. 839, the court said [page 840]:

"The evidence before the referee did not warrant a finding that the defendant had a present earning capacity of from $75 to $100 a week. While the defendant may have such potential capacity, there was lacking evidence of present opportunity to exercise it. While he offered proof through witnesses present at the hearing to substantiate his claim that it was impossible for him to secure employment in his line of business at the present time, their testimony was not received. In these circumstances the application to punish for contempt should not have been granted, particularly with respect to the amount of alimony that accrued during his confinement upon a prior commitment.

"The order granting plaintiff's application to punish the defendant for contempt must be reversed, therefore, and the motion denied without prejudice to a renewal on or after February 16, 1938, or upon a showing that the defendant has become able to satisfy the accruals in whole or in part. This determination, however, is upon condition that the defendant in the meantime pay to plaintiff at least a third of whatever he may earn or receive and that he furnish the affidavits directed to be served pursuant to the order of the Special Term, dated November 15, 1937, which affidavits in addition shall show effort to secure employment and with whom."

This New York case and the case of Wohlfort v. Wohlfort, 116 Kan. 154, 225 P. 746, 40 A.L.R. 538, touch upon the question of the ability to secure employment, a matter dwelled upon by appellant's counsel at length. He mentions the fact that many million of men are without employment at this time and have been during the entire period of the depression. The Wohlfort Case, decided in 1924, contains the following comment by the court: "He did get some employment of that kind, but, either because of the lack of skill in the trade or the fact that he did not belong to the Union, or both, he was unable to get steady employment or good wages. He undertook to join the Union, but his application was denied. * * *"

 It is generally held that inability of an alleged contemner without fault on his part to render obedience to a decree of

court is a good defense. 12 Am.Jur., p. 438; 9 A.L.R. 265; 22 A.L.R. 1260; 31 A.L.R. 649; 40 A.L.R. 546; 76 A.L.R. 390. These annotations show an apparent difference of opinion among the courts as to whether a failure to work is such a fault on the part of a defendant as gives the court jurisdiction to punish for failure to pay alimony. Late cases holding that imprisonment for failure to pay alimony is not imprisonment for debt, or that punishment may be inflicted for unwillingness, want of effort or neglect, are: Wohlfort v. Wohlfort, supra; Roper v. Roper, 242 Ky. 658, 47 S.W.2d 517; Ex parte Bighorse, 178 Okl. 218, 62 P.2d 487; Holloway v. Holloway, 130 Ohio St. 214, 198 N.E. 579, 581; Lindsey v. Lindsey, 158 Va. 647, 164 S.E. 551; Roach v. Oliver, supra; Heflinger v. Heflinger, 172 Ga. 889, 159 S.E. 242, 76 A.L.R. 386.

The problem of compelling a defendant to work is also treated in Going v. Going, 148 Tenn. 522, 256 S.W. 890, 31 A.L.R. 633, as follows [page 898]: "Some courts, indeed, have gone to the length of saying that a husband who has no property, but is able to work, must be imprisoned, the theory being that this will put a pressure on him to raise the money somehow. Fowler v. Fowler (1916) 61 Okl. 280, 161 P. 227, L.R.A.1917C, 89. Thus, it is stated (61 Okl. at page 286, 161 P. at page 232, L.R.A. 1917C, at page 95): 'The attachment will bring the actual resources of the respondent to a practical and decisive test. Pressure is a great concentrator and developer of force. Under the stress of an attachment even the vision of the respondent himself may be cleared and brightened, so that he will discern ways and means which were once hidden from him, or seen obscurely.' A contrary, and as it seems to us a better reasoned, view of this question was taken by the Supreme Court of South Carolina in the case of Messervy v. Messervy (1910) 85 S.C. 189, 67 S.E. 130, 30 L.R.A. (N.S.) 1001, 137 Am.St.Rep. 873, by the Supreme Court of Alabama in Webb v. Webb (1903) 140 Ala. 262, 37 So. 96, 103 Am.St.Rep. 30, and by the Supreme Court of California in the case of Ex parte Todd, 119 Cal. 57, 50 P. 1071. In the Alabama case, supra, the defendant made a sworn return to the rule, saying that he had no money or property with which to pay; that he had no employment, nor has he had any since the rendition of the decree, from which to earn money, etc.; and averred his readiness to pay as soon as he was able to procure the money. The court says: 'There seems to be no dispute about complainant being unable to pay the decree out of money or property, and the court so held. The only remaining insistence is, that he is able to work and will not work, to earn the money to make the payment, and the court ought to commit him for default in this respect. It is difficult to understand how the desired result was thus to be accomplished, and how the court would go about it. If complainant would not labor, the court was without power to inflict corporeal punishment to compel him. If it imprisoned him until he was willing to work, that would not have produced money, mean-

time, but would have entailed expense for the imprisonment; and if imprisoned and he should relent and come in and signify his willingness to labor, employment would have to be obtained for him, by the court, by himself or some one else; and how the court would have proceeded legally to hire him out, or supervise him, if he hired himself, and collect the money for application to its decree, has not been made to appear. In any effort in this direction it might undertake, the court would be careful not to violate the law against peonage for the sake of earning money. Such an effort, if undertaken, might involve the court and its agents in trouble, into which we would not knowingly induce or compel them.' This is the view adopted in 1 R.C.L. 962, and 2 Schouler on Marriage, Divorce and Separation (6th Ed.) § 1845. In the latter text it is stated that—'There is no contempt where the defendant is unable to pay, even though his inability arises from his willful refusal to work.' * * *" See, also, Maryott v. Maryott, 124 Neb. 274, 246 N. W. 343.

We take judicial cognizance of the industrial condition of the country and particularly of this state. The Department of Labor reports that millions of trained workers are unemployed. The court's finding that the appellant had the ability and strength to do certain kinds of work is not coupled with findings or evidence that appellant (who evidently would be rated in the lowest class of workers) could find employment. There is no evidence whatever that appellant has the pecuniary ability to comply with the judgment for support money.

We are constrained to hold that the court erred in committing the appellant to jail. For the reasons stated the judgment of the district court will be reversed and the cause remanded with directions to discharge the appellant and his bondsmen. However, this is without prejudice to the right to start another proceeding for contempt if the appellant later has the ability to pay and willfully and contumaciously refuses to comply with the judgment for support of his child.

It is so ordered.

SADLER, BICKLEY, BRICE, and ZINN, JJ., concur.