No. 52,360

ETHEL GUFFY, an Incapacitated Person, by and through Lawrence
Reeves, her Conservator and Next Friend, *Appellant,* v.
GEORGE GUFFY, *Appellee.*

(631 P.2d 646)

Opinion
filed July 17, 1981.

*Donald W. Vasos,* of Scott, Daily & Vasos, of Kansas City, argued the cause, and
*Dianna K. Stapleton,* of the same firm, was with him on the briefs for the
appellant.

*Wayne T. Stratton,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka,
argued the cause, and *Mark A. Buck,* of the same firm, was with him on the brief
for the appellee.

*'Kay Y. Rute,* of Carpenter & Carpenter, Chartered, of Topeka, and *Carol Duffy
McDowell,* of Levy & McDowell, of Topeka, were on the *amicus curiae* brief for
the American Civil Liberties Union.

*Justice B. King,* of Fisher, Patterson, Sayler & Smith, of Topeka, was on the
*amicus curiae* brief for the Kansas Association of Defense Counsel.

The opinion of the court was delivered by

FROMME, J.: This appeal presents the issue of whether this court
should continue to recognize interspousal tort immunity in Kan-
sas, which immunity was first recognized by this court in 1952.
See *Sink v. Sink,* 172 Kan. 217, 239 P.2d 933 (1952).

The present case arose from a one-car accident in Jackson
County, Kansas. The accident occurred on December 28, 1977.
George Guffy drove his automobile off the road and into a culvert.
His wife, Ethel Guffy, and three other women passengers re-
ceived severe injuries. We are concerned in this action with a
husband's liability, if any, for causing his wife's injuries. The
wife received severe brain and kidney damage plus several frac-
tured ribs. The injuries to her brain caused permanent loss of
ability to express thoughts and to understand speech. As a result
of Ethel Guffy's incapacity, a conservator was appointed to look
after her property and preserve her rights in action. The conser-
vator, Lawrence Reeves, then brought the present action in tort
against the husband, George Guffy, alleging negligence on his
part.

At all times since the accident Ethel Guffy has received continuous in-patient medical treatment at various hospitals and when not in a hospital, she has resided in a skilled nursing home facility. The conservator claims damages for Ethel Guffy's personal injuries in the sum of $100,000.00. The conservator points out that the husband George Guffy was insured against liability under a policy of motor vehicle liability insurance with policy limits up to $100,000.00 per person and $300,000.00 per accident.

The trial court sustained a motion for summary judgment in favor of the husband and against the conservator. The decision was solidly based on the doctrine of interspousal immunity as first announced by this court in the *Sink* case. Appellant concedes that the doctrine of interspousal immunity in Kansas must be abrogated if the judgment below is to be reversed and the case remanded for trial. Separate actions were also brought by the three other passengers for amounts totaling $535,000.00. The actions are pending in the trial court but they are of no present concern to this court.

We have been favored with four excellent briefs, one by the plaintiff, one by the defendant, one by the American Civil Liberties Union as *amicus curiae,* and one by the Kansas Association of Defense Counsel as *amicus curiae.* The briefs by the plaintiff and by the American Civil Liberties Union urge abrogation of the immunity. The briefs by the defendant and by the Kansas Association of Defense Counsel urge this court to adhere to the doctrine of interspousal immunity.

Depending on which brief you consult, the doctrine of interspousal immunity either is archaic and retreating into oblivion or it is vibrant and solidly based on the public policy of this State.

In Kansas the doctrine has been considered in light of our Constitution and the Kansas Married Women's Act. Article 15; § 6 of the Constitution of the State of Kansas provides:

"The legislature shall provide for the protection of the rights of women, in acquiring and possessing property, real, personal and mixed, separate and apart from the husband; and shall also provide for their equal rights in the possession of their children."

As to property owned by the parties at the time of the marriage, K.S.A. 1980 Supp. 23-201(*a*) provides:

"The property, real and personal, which any person in this state may own at the time of his or her marriage, and the rents, issues, profits or proceeds thereof, and

any real, personal or mixed property which shall come to him or her by descent, devise or bequest, or by gift from any person except his or her spouse, shall remain his or her sole and separate property, notwithstanding the marriage, and not be subject to the disposal of his or her spouse or liable for the spouse's debts."

As to property acquired by the parties during the marriage, subsection (b) of that statute provides:

"Property, other than property described in subsection (a) or property excluded by a written agreement by the parties, acquired by either spouse after marriage and before commencement of an action for divorce, separate maintenance, or annulment, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy or tenancy in common, shall be marital property. Each spouse has a common ownership in marital property which vests not later than the time of commencement by one spouse against the other of an action in which a final decree is entered for divorce, separate maintenance, or annulment, the extent of the vested interest to be determined and finalized by the court pursuant to K.S.A. 1978 Supp. 60-1610, and any amendments thereto."

K.S.A. 1980 Supp. 23-203 provides:

"A person may, while married, sue and be sued in the same manner as if he or she were unmarried."

In *Harrington v. Lowe,* 73 Kan. 1, 18, 84 Pac. 570 (1906), in referring to Art. 15, §§ 6, 9, it is said:

"These constitutional provisions themselves irretrievably broke down the common-law theory of marital unity, destroyed the notion of feminine subjection to baronial authority, threw off the restraints of coverture, and installed the modern doctrine of the equality of man and wife before the law."

In 1952 in the case of *Sink v. Sink,* 172 Kan. 217, this court for the first time held:

"Neither spouse may maintain an action in tort for damages against the other." Syl.

In the *Sink* case this court considered the constitutional provisions for married women as well as the statutory provisions which authorize a married woman to sue and be sued in the same manner as if she were unmarried. In adopting interspousal immunity Chief Justice Harvey, who authored the opinion, cited many cases from other states which had embraced interspousal immunity and stated:

"The reason normally given by the courts for such refusal [to abrogate immunity] is that it would be contrary to public policy and tend to disrupt the marital relation. We think the reasoning sound." 172 Kan. at 219.

Following *Sink* this court has continued to recognize and apply interspousal immunity in all cases coming before it.

In *O'Grady v. Potts,* 193 Kan. 644, 396 P.2d 285 (1964), the holding in *Sink* was approved. However, the court held that a woman could continue to maintain an action against a man whom she later married after the action accrued. The court reasoned that since the cause accrued before the marriage it was a personal property right held before marriage and could be retained and prosecuted after the marriage.

In *Fisher v. Toler,* 194 Kan. 701, 401 P.2d 1012 (1965), a divorce action was pending between the husband and wife when the personal injuries were inflicted. This court held that neither spouse could maintain an action in tort for personal injuries against the other so long as the marriage relationship continued. In the *Fisher v. Toler* opinion, the cases on the subject were reviewed again and the doctrine was applied. No cause of action by the wife was permitted.

In *Miles v. West,* 224 Kan. 284, 580 P.2d 876 (1978), this court recognized the law of *Sink* but held that interspousal immunity from torts does not prevent a determination of the percentages of causal fault of both the husband and the wife in a comparative negligence case when an action is filed on behalf of both husband and wife against a third party tortfeasor.

The foregoing is a brief summary of the law on the subject of interspousal immunity as it appears in the case law of Kansas. Now we turn to the arguments presented by the parties for and against change.

The appellant asserts that the overwhelming weight of current judicial authority favors abolition of immunity. An exhaustive annotation on the modern status of interspousal tort immunity in personal injury and wrongful death actions appears in 92 A.L.R.3d 901-959. We will not list the cases either from the states which retain immunity or from those which have abrogated it. However, we do note that there are five states that permit actions between spouses in motor vehicle cases only. There are six states which permit actions between spouses when based on an intentional tort. If these two categories are considered separately, the remaining states are about evenly divided.

After studying the cases from other states, we conclude the decisions are based upon the decisional law, the statutory law and the public policy of each respective state. As such, the cases are

not persuasive for the outcome of each case has been dictated by entirely different constitutional and statutory law. For instance, at least three states have interspousal immunity dictated by statute. 92 A.L.R.3d 901, § 5. Some states are community property states in which damages for personal injuries to a spouse become community property. In those states, in the absence of specific statute providing otherwise, the damages recovered would be controlled and managed by the husband. *Windauer v. O'Connor,* 107 Ariz. 267, 485 P.2d 1157 (1971). Some states do not have married women's acts and immunity in those states may be based on the common-law doctrine of the unity of husband and wife. Therefore, we do not believe the weight of current judicial authority from other states is either well defined or of significance in deciding the present question for Kansas.

The appellant argues the historical origins of interspousal immunity no longer exist for the unity of husband and wife has been discarded by the adoption of the married women's acts. Here, in Kansas, from the earliest time the rights of women have been recognized both in the Constitution and in a married women's act (Comp. L. 1879, ch. 62, § 1). See *Norris v. Corkill,* 32 Kan. 409, 4 Pac. 862 (1884). However, interspousal immunity was adopted in the *Sink* case in 1952, and found to be in harmony with both the Constitution and statutes of the State. Since that date we have had no change in either the constitutional or the statutory law relating to the question.

It is stated that perhaps the foremost justification for immunity is based on the premise that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home and this would be contrary to the public policy of the State. The authors of the Restatement of the Law of Torts have criticized this justification by stating such justification is based on the faulty premise that an uncompensated tort makes for peace in the family. They further state that the folly of that premise is apparent and the prevalence of liability insurance has gone far to remove the force of the argument. Restatement (Second) of Torts § 895F, comment *d* (1977).

We note that on April 24, 1981, Senate Bill No. 371 was signed into law in Kansas. Effective January 1, 1982, K.S.A. 1980 Supp. 40-3107 is amended so every policy of motor vehicle liability insurance issued by an insurer to an owner residing in this State

may contain various exclusions from coverage. The act provides that any insurer may exclude coverage for "any bodily injury to any insured or any family member of an insured residing in the insured's household." See S.B. 371 § 2 (i) (1). The effect is to authorize an insurer to exclude liability coverage to the insured and members of the insured's household if sued by one of the persons insured by the policy. With such an exclusion statutorily authorized in Kansas it would appear that the position of the Restatement may be flawed if applied to Kansas. Liability insurance coverage between members of the same household would not be extended to those insured.

There is room for concern in other areas, if and when personal tort actions are permitted between husband and wife. Consider the facts of the present case but remove the existence of liability insurance. (This absence of coverage may well occur in future cases after Senate Bill No. 371 becomes effective January 1, 1982.) Ethel Guffy has received severe brain damage and is unable to handle her real estate and personal property. Normally, with immunity from liability for the wife's injuries the husband could be appointed her guardian and conservator with less expense and trouble. However, if interspousal immunity is abrogated and the husband has, through negligence, caused the wife's injuries a conflict of interest surfaces. The husband cannot act as conservator. The wife is incapacitated. Her conservator in such case should be a disinterested person. The conservator has a fiduciary duty to look after the best financial interests of the wife. The conservator has no choice but to sue the husband. The husband's desire for family harmony cannot control the actions of the conservator. Without insurance coverage there is no separate fund to pay the judgment. A judgment against the husband in such case creates a serious burden on his own resources. The husband remains liable for the support of the wife whether she is healthy or ill and whether she is living with him or apart. *Lindbloom v. Lindbloom,* 177 Kan. 286, 279 P.2d 243 (1955). *Wohlfort v. Wohlfort,* 116 Kan. 154, Syl. ¶ 3, 225 Pac. 746 (1924). A spouse may have the implied authority to pledge the other's credit for "necessaries." See *Chipp v. Murray,* 191 Kan. 73, 76, 379 P.2d 297 (1963). The situation outlined above would disrupt and tend to destroy the peace and harmony of the home.

No one contends that the sanctity of every marriage should not

be fostered and protected. The parties to every marriage should be encouraged to live together and separation is to be discouraged. See *Ranney v. Ranney,* 219 Kan. 428, Syl. ¶ 2, 548 P.2d 734 (1976).

In addition to our case law there are statutes which have for their purpose the fostering of the family unit. For instance, K.S.A. 58-312 prevents one spouse from creating a lien upon the marital property without the consent of the other. K.S.A. 59-505 prevents one spouse from disposing by will of more than one-half of his or her property without the consent of the other. The public interest in marriage in Kansas is manifested by various statutory provisions addressing the formation, dissolution and maintenance of the marriage relationship. See K.S.A. 23-101 *et seq.,* K.S.A. 1980 Supp. 60-1610(*c*) and (*d*), and K.S.A. 1980 Supp. 23-201 *et seq.*

Other considerations should be noted. Under Kansas law, any recovery which plaintiff would make, should this action be allowed to proceed, would inure to the benefit of the defendant-husband. That is, all property acquired by either spouse during the marriage is "marital property," in which each spouse has a common ownership interest. K.S.A. 1980 Supp. 23-201(*b*). Furthermore, the husband is invested with a right to recover for his loss of consortium and loss of services. K.S.A. 1980 Supp. 23-205. Should the injured spouse die the surviving spouse or any one of the heirs at law may maintain an action for wrongful death for the benefit of all of the heirs, including the surviving spouse who would share in any recovery of losses. See K.S.A. 60-1902, 60-1905. Such an anomaly would be created if there is liability insurance available and interspousal immunity is abrogated. Such a result would be offensive to a sense of justice for it would allow a negligent party to profit by his own actions.

The attorney for the appellant speaking on behalf of the wife made the rather dramatic observation during oral arguments that George Guffy was understandably amazed after the automobile accident when he found out that he had insured everybody's wife against personal injuries except his own. The statement is somewhat misleading in that George Guffy purchased a liability insurance policy. Such a policy was purchased to protect George Guffy and other members of his household against lawsuits arising out of the ownership and operation of an automobile. The insurance company under such a policy is required to provide

George Guffy and members of his family with a defense to actions brought against them and to pay up to the limits set in the policy in settlement of such claims or in payment of judgments. Neither Ethel Guffy nor any other person was insured under the policy against personal injuries. Other types of insurance coverage are available to a family. Personal injury protection coverage, medical payments coverage and accident insurance may be purchased specifically for the purpose of protecting against injuries to a spouse and other members of the family.

Appellant argues that abrogation of interspousal immunity is a logical extension of what this court recently held in *Nocktonick v. Nocktonick,* 227 Kan. 758, 611 P.2d 135 (1980). In *Nocktonick* the court considered the question of whether an unemancipated minor child may recover damages in an action against a parent for injuries caused by the negligence of the parent in operating an insured motor vehicle. The appellant argues that the expressed public policy in Kansas of requiring insurance on all motor vehicles as enunciated in the Kansas Automobile Injury Reparations Act virtually compels the abrogation of immunity when personal injury arises from the negligent operation of an insured motor vehicle. The premise on which this conclusion is reached is no longer true. The legislature has now amended the Kansas Automobile Injury Reparations Act by enacting Senate Bill No. 371. Effective January 1, 1982, an insurer is given and will no doubt exercise its right in liability insurance policies to exclude coverage of "any bodily injury to any insured or any family member of an insured residing in the insured's household."

Also, the decision in *Nocktonick* was premised on personal injuries caused by the negligence of a parent in the operation of a motor vehicle. The court was aware of the insurance laws of the State in effect when the decision was rendered. 227 Kan. at 769, 770. In addition, that decision is distinguishable from the present question because the parent-child relationship had not been the subject of extensive judicial and legislative action when *Nocktonick* was decided. In *Nocktonick,* this court was not faced with the rule of stare decisis, as it is in the present case.

It is not always easy to determine the proper ambit of the court's authority on an issue of the present kind. We must not discard the time-tested advantages of consistency and uniformity in the fabric of the law to do that which we might conceive to be

justice in a particular instance. Many statutes in Kansas establish and protect the marital relationship. We as judges may have the power, though not the right, to ignore the ultimate effects of legislative pronouncements. History teaches us that departures from clear principles of law lead to more and more departures, many of which for the moment may seem in the highest public interest; but, when that happens, the day will soon come when personal preferences of judges overcome long established principles, and the law instead of being rules governing action becomes vacillating judgments dependent upon the particular membership of the court at any given time.

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' " Cardozo, The Nature of the Judicial Process, at 141 (1921).

We have considered all arguments put forth in the briefs submitted by the parties and by *amici curiae* even though we do not have time to discuss them. We conclude the doctrine of interspousal immunity presently existing in Kansas is vibrant and solidly based on the public policy of this State. It should not be abrogated. The interspousal immunity adhered to in this case is limited to that recognized in *Sink v. Sink,* 172 Kan. 217. Neither spouse may maintain an action against the other for tortious personal injury occurring during marriage. This decision does not deal with intentional torts or suits to determine rights in real or personal property.

The judgment of the district court is affirmed.

PRAGER, J., dissenting: I respectfully dissent from the opinion of the majority which breathes further life into the outmoded doctrine of interspousal immunity from tort liability. Interspousal immunity was adopted by this court in *Sink v. Sink,* 172 Kan. 217, 239 Kan. 933 (1952), after only a cursory examination of the issues and policies involved. Since *Sink,* the doctrine has been summarily followed in subsequent Kansas cases without reexamination of its underlying premises. It cannot be denied that there is a wide difference of opinion on this issue in this country held by reasonable persons of good faith. It is my judgment,

however, that both public policy and logic require the abrogation of the doctrine in Kansas at this time.

At the outset, it would be helpful to consider generally the subject of immunities in the area of tort law. One of the basic concepts of law in a free society is that a citizen should be held responsible for his tortious acts which injure the person or property of others. To carry out that responsibility, the law ordinarily places upon every citizen the duty to exercise reasonable care for the safety of other citizens. An immunity has the effect of conferring a special status on the possessor of the immunity, so that he may avoid liability in tort under all circumstances within the limits of the immunity. The effect of an immunity is to give certain citizens a free ride and to relieve them of the responsibility which the law imposes on others.

Under the common law, immunities from tort responsibility were once broad in scope and were much more favored then than they are at the present time. The modern tendency has been to view immunities with a considerable degree of disapproval and to insist upon good reasons for their continued existence. During the past century, immunities which once were widely recognized and accepted have been abolished or seriously restricted. In this process, a great deal of disagreement has arisen among the courts of different jurisdictions, which is largely a matter of the different stages reached along the road to complete abrogation. Many highly artificial rules and distinctions have been adopted by courts as a means of restriction and limitation. As a result, there is now no complete immunity from all tort liability that is recognized and effective in all jurisdictions.

A number of the common-law immunities which existed earlier in this state's judicial history have been abolished either by judicial decision or by statute. For example, in 1954 this court by judicial decision abolished the common-law immunity granted charitable institutions. *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P.2d 934 (1954). In 1931 the legislature granted an immunity by enacting the Kansas Guest Statute (K.S.A. 8-122b) which provided, in substance, that no person who was a guest passenger in a motor vehicle should have a cause of action for personal injuries against the owner or operator of the vehicle unless gross and wanton negligence of the operator could be established. In 1974, the immunity was stricken down as uncon-

stitutional by this court in *Henry v. Bauder,* 213 Kan. 751, 518 P.2d 362 (1974). In more recent years, the absolute common-law immunity of the state from tort claims of injured citizens was modified by the Kansas Tort Claims Act (K.S.A. 1980 Supp. 75-6101 *et seq.*), which now provides a remedy for citizens having tort claims against the state and its political subdivisions.

This trend toward the abolition of immunities is supportive of the basic public policy set forth in Section 18 of the Bill of Rights of the Kansas Constitution, which provides that all persons, for injuries suffered in person, reputation or property, shall have a remedy by due course of law. In considering immunity from tort liability, this court should take the approach that a particular immunity should be looked upon with suspicion and should be sustained only where there is some important public policy to support it. With these concepts in mind, I now turn to a discussion of interspousal immunity.

Interspousal immunity is a creature of the common law. The doctrine is based on the fiction of marital unity, with the woman's legal identity merging into that of her husband's upon marriage. The husband became the owner of all of her property and her legal representative in all matters. The common law relating to the rights and power of married women took the position that the union of the married pair would be destroyed by allowing any opportunity for a divided will. On marriage, the woman acquired nothing but a right to support. She was despoiled of all her goods, chattels, and money, which the husband might dispose of as absolutely as if they had always belonged to him, and which he might will away from her at his death. If she acquired property she could not hold it—it went to him. She could not make a contract or a testamentary disposition of her property, because she had no independent will of her own. The husband was the guardian of her children. The husband could restrain her person, and impose corporal punishment upon her for the purpose of restoring that concord and harmony which marital unity required. *Harrington v. Lowe,* 73 Kan. 1, 17, 84 Pac. 570 (1906).

The common law did place a limitation on the right of a husband to discipline his wife. In its wisdom, it gave a husband the right to beat his wife, provided he used a switch no larger than his thumb. The wife was incapable of bringing suit or being sued without the joinder of her husband. Suit between husband and

wife was precluded by the joinder rule, which would have required the husband to sue himself. In the late 1800's, states began to enact Married Women's Acts, for the purpose of removing these disabilities. See, *Thompson v. Thompson,* 218 U.S. 611, 615, 54 L.Ed. 1180, 31 S.Ct. 111 (1910); *Norris v. Corkill,* 32 Kan. 409, 411, 4 Pac. 862 (1884).

Despite these statutes, courts were reluctant to recognize personal tort liability between spouses, while acknowledging the statutes' removal of immunity in contract and property actions. See, Prosser on Torts, pp. 881-82 (3d ed. 1964); Restatement (Second) of Torts § 895F, Comment c at pp. 424-25 (1979); 92 A.L.R.3d 901, § 2. For example the Supreme Court considered the viability of the doctrine in light of an enabling provision in the D.C. Code in *Thompson v. Thompson,* 218 U.S. 611. The wife was seeking damages for her personal injuries caused by her husband's assault and battery upon her. The statute in question allowed women the power to sue on contracts and property, as well as "for torts committed against them, as fully and freely as if they were unmarried." The court traced the history of interspousal immunity to the common-law theory of spousal unity, which precluded the wife's suit without joinder of her husband. It was acknowledged that the purpose of the Married Women's Acts was to remove these legal disabilities. The majority, however, found no legislative intent to abolish interspousal tort immunity. Doubt was expressed that the allowance of suit by one spouse in tort for personal injuries would promote "the public welfare and domestic harmony." 218 U.S. at 618. Abolition of the immunity was considered a matter solely of legislative concern, and such "radical and far-reaching changes in the law" would require "language so clear and plain as to be unmistakable evidence of the legislative intent." 218 U.S. at 618. Additional concern was expressed that allowing interspousal tort actions would result in a flood of frivolous suits. Furthermore, the majority reasoned, the wife was not without alternative remedies, but could sue her tort-feasor husband for separation, divorce, or alimony, or could press criminal charges against him.

The majority of jurisdictions, considering the effect of married women's acts on the doctrine of interspousal immunity, acknowledged the repeal of the fictional marital unity and the ability of one spouse to sue the other on contracts or property

rights, but initially adopted the *Thompson* policy justifications to perpetuate tort immunity. Some jurisdictions, however, interpreted the married women's acts to abolish all disabilities, including the bar to personal tort actions against a spouse. In recent years, there has developed a distinct trend in jurisdictions initially retaining the doctrine to now abolish it as outmoded and contrary to the realities of contemporary society.

As of October, 1980, those states which have abolished interspousal immunity in whole or in part are:

| | |
|---|---|
| Alabama | - *Johnson v. Johnson,* 201 Ala. 41, 77 So. 335 (1917); *Bennett v. Bennett,* 224 Ala. 335, 140 So. 378 (1932); |
| Alaska | - *Cramer v. Cramer,* 379 P.2d 95 (Alaska 1963); |
| Arkansas | - *Katzenberg v. Katzenberg,* 183 Ark. 626, 37 S.W.2d 696 (1931); *Leach v. Leach,* 227 Ark. 599, 300 S.W.2d 15 (1957); |
| California | - *Klein v. Klein,* 58 Cal. 2d 692, 26 Cal. Rptr. 102, 376 P.2d 70 (1962); |
| Colorado | - *Rains v. Rains,* 97 Colo. 19, 46 P.2d 740 (1935); |
| Connecticut | - *Brown v. Brown,* 88 Conn. 42, 89 A. 889 (1914); *Bushnell v. Bushnell,* 103 Conn. 583, 131 A. 432 (1925); |
| Idaho | - *Lorang v. Hays,* 69 Idaho 440, 209 P.2d 733 (1949); *Rogers v. Yellowstone Park Company,* 97 Idaho 14, 539 P.2d 566 (1975); |
| Indiana | - *Brooks v. Robinson,* 259 Ind. 16, 284 N.E.2d 794 (1972); |
| Iowa | - *Shook v. Crabb,* 281 N.W.2d 616 (Iowa 1979); |
| Kentucky | - *Brown v. Gosser,* 262 S.W.2d 480 (Ky. 1953); *Layne v. Layne,* 433 S.W.2d 116 (Ky. 1968); |
| Maine | - *MacDonald v. MacDonald,* 412 A.2d 71 (Me. 1980); |
| Maryland | - *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978) (participation in gunpoint gang-rape); |
| Massachusetts | - *Brown v. Brown,* 381 Mass. 231, 409 |

|  | N.E.2d 717 (1980); *Lewis v. Lewis,* 370 Mass. 619, 351 N.E.2d 526 (1976); |
|---|---|
| Michigan | - *Hosko v. Hosko,* 385 Mich. 39, 187 N.W.2d 236 (1971); |
| Minnesota | - *Beaudette v. Frana,* 285 Minn. 366, 173 N.W.2d 416 (1969); |
| Nebraska | - *Imig v. March,* 203 Neb. 537, 279 N.W.2d 382 (1979); |
| Nevada | - *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974) (motor vehicles); |
| New Hampshire | - *Lundburg v. Hagen,* 114 N.H. 110, 316 A.2d 177 (1974); *Miltimore v. Company,* 89 N.H. 272, 197 A. 330 (1938); *Gilman v. Gilman,* 78 N.H. 4, 95 A. 657 (1915); |
| New Jersey | - *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951 (1978); *Immer v. Risko,* 56 N.J. 482, 267 A.2d 481 (1970); |
| New Mexico | - *Maestas v. Overton,* 87 N.M. 213, 531 P.2d 947 (1975); |
| New York | - *State Farm Mut. Ins. v. Westlake,* 35 N.Y.2d 587, 364 N.Y.S. 482, 324 N.E.2d 137 (1974); |
| North Carolina | - *Foster v. Foster,* 264 N.C. 694, 142 S.E.2d 638 (1965); |
| North Dakota | - *Fitzmaurice v. Fitzmaurice,* 62 N.D. 191, 242 N.W. 526 (1932); |
| Oklahoma | - *Courtney v. Courtney,* 184 Okla. 395, 87 P.2d 660 (1938); |
| Rhode Island | - *Digby v. Digby,* _____ R.I. _____, 388 A.2d 1 (1978) (motor vehicle); |
| South Carolina | - *Pardue v. Pardue,* 167 S.C. 129, 166 S.E. 101 (1932); |
| South Dakota | - *Scotvold v. Scotvold,* 68 S.D. 53, 298 N.W. 266 (1941); |
| Texas | - *Bounds v. Caudle,* 560 S.W.2d 925 (Tex. 1977) (intentional acts); |
| Vermont | - *Greenwood v. Richard,* 131 Vt. 98, 300 A.2d 637 (1973) (motor vehicle); |
| Virginia | - *Korman v. Carpenter,* 216 Va. 86, 216 S.E.2d 195 (1975) (intentional torts); *Surratt, Adm'r* |

|              | *v. Thompson,* 212 Va. 191, 183 S.E.2d 200 (1971) (motor vehicles); |
| Washington   | - *Freehe v. Freehe,* 81 Wash. 2d 183, 500 P.2d 771 (1972); |
| West Virginia | - *Coffindaffer v. Coffindaffer,* _____ W.Va. _____, 244 S.E.2d 338 (1978); |
| Wisconsin    | - *Wait v. Pierce,* 191 Wis. 202, 209 N.W. 475 (1926). |

As Justice Fromme points out in the majority opinion, some of these states have totally abolished interspousal immunity, while others have restricted it to certain tort actions and have abolished it as to others. A full discussion of these cases may be found at 92 A.L.R.3d 901.

Kansas, like many other states, judicially opted to retain common-law interspousal immunity, despite constitutional and statutory provisions insuring a remedy in the courts for civil wrongs and removing common-law disabilities. The applicable Kansas constitutional and statutory provisions state as follows:

"§ 18. **Justice without delay.** All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." (Bill of Rights.)

Art. 15, "§ 6. **Rights of women.** The legislature shall provide for the protection of the rights of women, in acquiring and possessing property, real, personal and mixed, separate and apart from the husband; and shall also provide for their equal rights in the possession of their children."

K.S.A. 1980 Supp. "23-203. **Sue and be sued.** A person may, while married, sue and be sued in the same manner as if he or she were unmarried."

Under these provisions the Kansas Supreme Court held in several cases that a wife could sue her husband on causes of action involving *property* rights. In *Helm v. Helm,* 11 Kan. 19 (1873), a wife was permitted to bring an action to cancel a deed for the conveyance of the homestead, which her husband, by threats, had forced her to sign. In *Green v. Green,* 34 Kan. 740, 10 Pac. 156 (1886), a husband was permitted to maintain an action against his wife and other persons to have certain fraudulent deeds set aside. The right of one spouse to sue the other was not recognized, however, where the injuries involved *personal rights* as distinguished from property rights. Rights of property were obviously considered to be of more importance than personal rights.

In *O'Grady v. Potts,* 193 Kan. 644, 396 P.2d 285 (1964), this court allowed a wife to maintain an action against her husband

for personal injuries caused by his negligence, where the negligent conduct occurred *before* marriage. The negligence causing the injuries was held to result in a chose in action, a *property right,* accruing to the benefit of the wife. Since the right of action was deemed a property right acquired before marriage, the wife was able to protect that property interest through legal process after marriage. See K.S.A. 1980 Supp. 23-201 (property acquired by a person before marriage remains his or her sole property after marriage). The court did not discuss the policy rationale of preserving domestic harmony and tranquility, and did not explain why an action pursued during marriage based on conduct before marriage would be any less disruptive than an action based on conduct occurring during the marriage. If the right to recover damages for personal injuries is a *property right,* why isn't this true whether the injury occurred both before or *after* the marriage? The practical distinction made in *O'Grady* is this: A woman who is injured in an automobile accident due to the negligence of her fiance while enroute to the church for the wedding ceremony may later sue her husband and recover damages for her personal injuries. But a wife, who is injured due to the negligence of her husband after the wedding ceremony while in the process of leaving the church, is barred from bringing an action. The reasoning behind this is questionable.

This court's decision in *Fisher v. Toler,* 194 Kan. 701, 401 P.2d 1012 (1965), has been criticized as an unreasonable and blind adherence to an antiquated doctrine. See *Interspousal Immunity—Time for a Reappraisal,* 27 Ohio St. L.J. 550 (1966). In *Fisher,* the parties had been separated and ultimately divorced, with the tortious conduct occurring during the pendency of divorce proceedings. The wife allegedly sustained serious personal injuries when her estranged husband intentionally drove his automobile into hers at a high rate of speed, and continued to ram her vehicle three more times while she was still inside. The court adhered to the conclusion in *Sink,* that one spouse may not sue the other in tort. The court further declined to make an exception for intentional torts, holding such distinction to be within the province of the legislature. The majority did not discuss the concern of Justices Fontron and Wertz expressed in the dissenting opinion, that public policy did not support application of the doctrine to intentional torts, particularly where, as

here, the "[d]omestic harmony had already been fractured." 194 Kan. at 704. Kansas, then, has adhered to the doctrine of interspousal tort immunity on the following grounds:

(1)  *stare decisis;*
(2)  no express statutory authorization for interspousal tort actions; and
(3)  public policy for the protection of marital harmony and tranquility.

Other jurisdictions have included the following additional considerations:

(4)  possibility of fraud or collusion, particularly where there is insurance;
(5)  overburdening the courts with a multitude of trivial and frivolous suits; and
(6)  adequacy of alternative remedies.

I will discuss each of these matters separately.

*Stare Decisis*—Adherence to Precedent.

The primary reason relied on by the majority opinion for the retention of the doctrine of interspousal immunity is that we should not depart from our prior decision in *Sink v. Sink,* 172 Kan. 217, and later Kansas decisions relying thereon. The opinion questions the desirability of departing from established principles of law. The reliance by a court on decisions previously handed down is known as the doctrine of *stare decisis,* a Latin expression which means literally, "Let the decision stand." It cannot be denied that the rule of *stare decisis* is needed to provide a stable society. Established legal principles which have been found workable and just provide the pillars which structure our society. People must have some idea what their rights and responsibilities are. It would be difficult for a citizen to live comfortably in a society where the law changed every week depending on the whim of each judge who had his case. We must recognize, however, that pillars of a building have a way of decaying and deteriorating from age. Likewise, pillars of the law, like pillars in a building, must be repaired or replaced from time to time to prevent the whole structure from collapsing. The courts of this country must recognize that the law is a changing force and, under our system, courts have always had the obligation to change the law to meet the needs of the people in a changing society at particular times. Thus, the courts have a two-fold responsibility of both preserving the law and changing the law by

developing new legal principles to meet modern needs. It, of course, takes a great deal of wisdom to know which objective is the most important at any particular time.

Other jurisdictions reconsidering the wisdom of interspousal immunity have acknowledged the courts' authority and duty to reexamine the common law and to modify, alter, and discredit doctrines to comply with the changes and needs of modern society. See for example *Rupert v. Stienne,* 90 Nev. at 399 (the flexibility and adaptability of the common law allowed the court to reexamine and abrogate common-law interspousal immunity, though the court had previously held such modification to be a matter of legislative concern); *Digby v. Digby,* _____ R.I. _____, _____, 388 A.2d 1, 2; *Lewis v. Lewis,* 370 Mass. at 628 (the court has not only the authority, but duty to reexamine its precedents before continued application of common-law interspousal immunity); *Freehe v. Freehe,* 81 Wash. 2d at 189.

In *Brooks v. Robinson,* 259 Ind. 16, the Supreme Court of Indiana, in abolishing the doctrine of interspousal immunity, made the following comment:

"It is next urged by counsel for defendant-appellee that if the doctrine of interspousal immunity is to be abolished, the courts should wait for legislative sanction for such action. However, as observed beforehand, the doctrine is a creature of the common law and is therefore judicially created. Judicial devotion to the doctrine of *stare decisis* is indeed a justifiable concept to be followed by our courts. However, it cannot and must not be so strictly pursued to the point where our view is opaqued and reality disregarded. To do so is to envision the common law to be as immutable as the laws of the Medes and Persians, and thus render our system of jurisprudence forever impotent. The strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs." pp. 22-23.

The majority opinion has quoted from Cardozo, The Nature of the Judicial Process, p. 141 (1921). In discussing adherence to precedent, Cardozo in the same work, at pages 151-52, has this additional comment:

"[T]he words of Wheeler, J., in *Dwy v. Connecticut Co.,* 89 Conn. 74, 99, express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method

of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature.' If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."

The Supreme Court of Kansas has recognized that the fact that a court may have, at an earlier date and in response to what appeared desirable as a matter of policy, created immunity from wrongdoing is not a sound reason for continuing the immunity when it later appears to be basically unsound, especially when the reasons upon which the immunity was based no longer exist. See Justice Wertz's opinion in *Noel v. Menninger Foundation,* 175 Kan. 751.

To the same effect is the comment of Justice Fontron in *Steele v. Latimer,* 214 Kan. 329, 332, 521 P.2d 304 (1974), where he states:

"It has been said that the development of the common law has been determined largely by the social needs of the society it was designed to serve, and that the capacity for growth and change is one of its most significant features. [Citation omitted.] The most casual student of ages past would agree that the principle of change runs deeply through human history and like a golden thread weaves new 'people requirements' into the fabrics of altered social patterns.

. . . .

"This court has never been disposed . . . 'to resuscitate [the] obsolete subtlety of the common law.' To the contrary, where a common law principle has been found unsuited to the conditions . . . its application has been rejected."

One might well argue with this court's conclusion in *Sink* that K.S.A. 23-203 (now 1980 Supp.) did not specially authorize interspousal tort actions. That statute authorizes a married person to sue and be sued as if unmarried, *without qualification or exception.* The obvious import of the statute would seem to be to allow a married person to sue any other person for damages resulting from the latter's misconduct, including suit against a spouse for personal injuries. If the statute is construed to allow interspousal actions to preserve property rights and to enforce contracts between spouses, it must also be construed to allow interspousal tort suits. There is a glaring absence of any indication of legislative intent to except married persons from personal tort liability to their spouses. See, *e.g., Scotvold v. Scotvold,* 68 S.D. at 58 (married women's act gives them legal rights against the whole world, including their husbands, and does not simply put them

on equal legal footing with their husbands as against third parties), and Harlan, J., dissenting, with Holmes and Hughes, JJ., in *Thompson v. Thompson,* 218 U.S. at 621. Certainly this court has authority to correct what now appears to be an erroneous statutory interpretation. *Prowant, Administratrix, v. Kings-X,* 185 Kan. 602, 347 P.2d 254 (1959) (*stare decisis* does not require adherence to a former decision manifestly in error, even if the legislature had had the opportunity to correct the court's error).

### Disruption of Marital Harmony

An increasing number of jurisdictions are rejecting the argument that continued adherence to interspousal tort immunity is necessary for the protection of marital harmony and tranquility. It has been considered inconsistent to apply interspousal tort immunity while allowing other interspousal actions not sounding in tort (*Rupert v. Stienne,* 90 Nev. at 402; *Digby v. Digby,* _____ R.I. at _____, 388 A.2d at 3) and which are no less likely to cause marital discord than tort actions (*Greenwood v. Richard,* 131 Vt. at 105). In *Brooks v. Robinson,* 259 Ind. at 19-20, it was explained:

" '[It] appears to be a glaring inconsistency . . . that a wife is given the right to sue her husband for a broken promise involving property, and for a wrecked house belonging to her, but not for a broken arm nor a broken body. To make such a distinction renders the person of the wife in a marriage completely subjugated to the will of her husband, as far as civil liability is concerned, for willful and wanton injuries inflicted upon her person . . . during marriage, and that such injuries are of no concern or value when placed in the scales of justice alongside property rights. This seems to be inconsistent, inhumane, and contrary to the true spirit and intent of the acts passed for the emancipation of women in an enlightened civilization.' [Citation omitted.]"

Similar reasoning is found in Prosser on Torts § 116, 883 (3d ed. 1964):

"The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy—and this even though she has left him or divorced him for that very ground, and although the same courts refuse to find any disruption of domestic tranquility if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it."

See also, Restatement (Second) of Torts § 895F, Comment d.

Whether intentional or merely negligent, this court has recently acknowledged that it is more likely the tortious conduct, rather than the suit for compensation, which causes the disruption to family relations. *Nocktonick v. Nocktonick,* 227 Kan. 758, 768, 611 P.2d 135 (1980) (parental immunity). This rationale is equally applicable to the consideration of interspousal tort immunity. For example, in *Freehe v. Freehe,* 81 Wash. 2d 187, the court rejected the marital harmony argument, stating:

"On reflection, we are convinced that this is a conclusion without basis. If a state of peace and tranquility exists between the spouses, then the situation is such that either no action will be commenced or that the spouses—who are, after all, the best guardians of their own peace and tranquility—will allow the action to continue only so long as their personal harmony is not jeopardized. If peace and tranquility are nonexistent or tenuous to begin with, then the law's imposition of a technical disability seems more likely to be a bone of contention than a harmonizing factor."

See, also, *Rupert v. Stienne,* 90 Nev. at 402 (where a state of tranquility exists, no action will be commenced).

Perhaps the best argument in favor of discarding the marital harmony justification is found in *Coffindaffer v. Coffindaffer,* _____ W. Va. _____, 244 S.E.2d 338, where the court states:

"[I]t is difficult to perceive how any law barring access to the courts for personal injuries will promote harmony. If this were a valid sociological consideration, the Legislature could orchestrate even greater harmony by abolishing the statute giving the right to divorce." p. 342.

In the present case, there can be no serious contention that to allow this action would disrupt the marital harmony and tranquility. The evidence is undisputed that Mrs. Guffy is now incapacitated, permanently institutionalized, and without the ability to communicate or to understand what is spoken to her. There is simply no marital relationship left to disrupt. Moreover, Mr. Guffy carried automobile liability insurance, available for the compensation of others injured in the same accident, and only denied to Mrs. Guffy because of her relationship to the insured tort-feasor.

Many courts agree that there is no disruption to the marital relationship where, as here, there is liability insurance, because the insurer, rather than the spouse, is the real party defendant. See, *e.g., Beaudette v. Frana,* 285 Minn. at 371 ("the social gain of providing tangible financial protection for those whom an in-

sured wrongdoer ordinarily has the most natural motive to protect transcends the more intangible social loss of impairing the integrity of the family relationship"). In fact, numerous cases have limited the abrogation of interspousal tort immunity to automobile negligence cases, because of the prevalence of, or presence of statutorily mandated automobile liability insurance. See, *e.g.*, *Greenwood v. Richard,* 131 Vt. 98; *Digby v. Digby,* _____ R.I. _____, 388 A.2d 1; *Lewis v. Lewis,* 370 Mass. 619. In *Surratt, Adm'r v. Thompson,* 212 Va. 191, 183 S.E.2d 200 (1971), the high incidence of automobile liability insurance was held to have vitiated any justification for retention of interspousal immunity in automobile negligence cases, and as explained in *Smith v. Kauffman, Adm'r,* 212 Va. 181, 185, 183 S.E.2d 190 (1971):

" 'Domestic harmony may be more threatened by denying a cause of action than by permitting one where there is insurance coverage. The cost of making the insured spouse whole would necessarily come out of the family coffers, yet a tortfeasor spouse surely anticipates that he will be covered in the event his negligence causes his spouse injuries. This unexpected drain on the family's financial resources could likely lead to an interference with the normal family life. . . . In short, the immunity doctrine cannot be fairly sustained on the basis that negligence suits between husbands and wives will disrupt the harmony of the family.' " Citing *Immer v. Risko,* 56 N.J. 482, 489-90, 267 A.2d 481 (1970).

Compulsory automobile liability insurance was the basis of this court's decision to reject parental immunity in automobile negligence cases in *Nocktonick.* The majority opinion distinguishes *Nocktonick* primarily on the subsequent enactment of legislation authorizing the exclusion of family members from automobile liability policies (overruling this court's conclusion in *DeWitt v. Young,* 229 Kan. 474, 625 P.2d 478 [1981], that such exclusions were void as contrary to legislative dictates of mandatory coverage). The majority's reliance on this enactment is misplaced. First, the statute does not affect the facts of this case. Mr. Guffy possessed liability insurance. This is not a case where Mrs. Guffy is challenging the validity of an exclusion within the policy. The only impediment to her recovery under the terms of the policy is this court's adherence to interspousal immunity. Second, the statute only authorizes the exclusion, and does not mandate its inclusion in all subsequent automobile liability insurance policies. There is nothing to keep the insurer and insured from contracting for liability coverage over that required by law, and extending it to family members. The availability of such

insurance will be precluded, however, if this court maintains its position that a spouse cannot recover from a spouse-tortfeasor.

### Encouragement of Fraud and Collusion

If insurance coverage refutes the family harmony justification, its presence serves as the basis of arguments that interspousal tort suits would encourage fraud and collusion. Courts rejecting interspousal immunity resoundingly reject this argument as slander to the integrity of our judicial system. See, *e.g., Rupert v. Stienne,* 90 Nev. at 401; *Greenwood v. Richard,* 131 Vt. at 101; *Freehe v. Freehe,* 81 Wash. 2d at 188-89; *Brooks v. Robinson,* 259 Ind. at 21; *Beaudette v. Frana,* 285 Minn. at 372. These courts unanimously agree that spurious and unmeritorious claims are to be determined by the courts and the juries. Precluding all tort claims between spouses on this basis alone runs afoul of the general principle that an injured party should have redress in the courts against the party causing the injury, absent substantial, countervailing public policy reasons. See, *e.g., Digby v. Digby,* _____ R.I. at _____, 388 A.2d at 4; *Lewis v. Lewis,* 370 Mass. 619.

This court reached the same conclusion when considering the possibility of fraud and collusion as a basis for adopting parental immunity in *Nocktonick v. Nocktonick,* 227 Kan. at 768-69:

"We recognize a practical problem is that of possible collusion between parent and child aimed at securing an unjustified recovery from an insurance company. But the possibility of collusion exists to a certain extent in any case. Every day we depend on juries and trial judges to sift evidence in order to determine the facts and arrive at proper verdicts. Experience has shown that the courts are quite adequate for this task. In litigation between parent and child, judges and juries would naturally be mindful of the relationship and would be even more on the alert for improper conduct. We further must recognize that, under provisions ordinarily included in an insurance policy, the insurance company has the right to disclaim liability when there is lack of cooperation with the insurance company on the part of the insured. Lack of cooperation may be found in inconsistent or contradictory statements by the insured or in collusion between the injured party and the insured which results in false statements to the company."

The insurer's ability to investigate and discover fraudulent suits was also recognized in *Coffindaffer v. Coffindaffer,* _____ W. Va. at _____, 244 S.E.2d at 342-43, where the court explained:

"[I]n suits for personal injuries, the issue is not only liability, as such cases assume real proportions only if there are valid personal injuries of some magnitude. While one can foresee that some spouses may collude to establish liability, it becomes totally strained to conceive that a substantial personal injury can be faked through the rigors of available discovery techniques.

> "There may be those desperate couples who conclude that the prospect of a substantial monetary recovery is worth the pain of self-inflicted injuries. One can hardly imagine that the legal system will break down with cases brought by spouses who have flung themselves down the cellar steps or permitted the other spouse to strike them with the family car in order to achieve the type of substantial injury that makes jury litigation worthwhile."

The *Coffindaffer* court also laid to rest any argument that the possibility of collusive suits will remain when, as the majority suggests, automobile liability policies routinely exclude liability to household members:

> "The question of fraud and collusion can scarcely have any serious relevancy in those cases where there is no insurance fund available. It beggars the imagination to believe that a husband and wife will conspire with each other to accomplish a physical injury to one that will ultimately be paid out of the other's pocket, and additionally the attorneys' fees to obtain it." p. 343.

The majority opinion does not discuss the possibility of fraud and collusion in reaching its decision. It is clear, under the authority of *Nocktonick* and cases from other jurisdictions cited herein, that the possibility of fraudulent and collusive suits will not support personal tort immunity.

### Frivolous and Unmeritorious Suits

Similarly, the fear of a flood of frivolous and unmeritorious suits does not justify the continuation of interspousal tort immunity. Certain risks of negligent contact are inherent in the marital relationship, and conduct which would be tortious between two strangers may not be tortious between spouses. *Lewis v. Lewis,* 370 Mass. at 630. In *Beaudette v. Frana,* 285 Minn. at 373, it was held that:

> "The risks of intentional contact in marriage are such that one spouse should not recover damages from the other without substantial evidence that the injurious contact was plainly excessive or a gross abuse of normal privilege. The risks of negligent conduct are likewise so usual that it would be an unusual case in which the trial court would not instruct the jury as to the injured spouse's peculiar assumption of risk."

Accord, *Freehe v. Freehe,* 81 Wash. 2d at 188 ("consent" and "assumption of risk" are applicable to "minor annoyances associated with the ordinary frictions of wedlock"). Additionally, experience does not support the argument that abrogation of interspousal immunity will result in a flood of litigation. See *Rupert v. Stienne,* 90 Nev. at 403; *Greenwood v. Richard,* 131 Vt. at 105.

It should also be noted that the doctrine of interspousal immunity was abrogated over 60 years ago in Connecticut, Oklahoma, New Hampshire, Alabama, North Carolina, and South Carolina.

### Alternative Remedies

The final argument normally asserted in justification of interspousal immunity is the existence of alternative remedies, such as divorce, separation, or criminal prosecution. See *Thompson v. Thompson,* 218 U.S. at 619. This assertion is subject to question, because it is inconsistent with the concept that immunity will promote domestic harmony. As noted previously, it is unlikely that a personal tort action will be any more disrupting to the marriage than divorce or criminal proceedings. *Greenwood v. Richard,* 131 Vt. at 105; *Courtney v. Courtney,* 184 Okla. 395. The argument has also been rejected because these "alternative remedies" do not provide compensation to the victim for injuries sustained. *Freehe v. Freehe,* 81 Wash. 2d at 187. See also Prosser on Torts at 883.

The majority opinion raises several arguments not generally raised in interspousal immunity cases. The opinion expresses concern for those cases where the injured spouse is incapacitated and there is no liability insurance. The majority concludes that the appointed conservator would be obligated to sue for damages on behalf of the injured spouse. This concern is easily swept away with the rejection of the marital harmony rationale. Furthermore, this assertion is only speculation. This court should let experience judge the effect of allowing interspousal tort suits, *Beaudette v. Frana,* 285 Minn. at 373 (court can reinstate interspousal immunity if experience establishes its necessity), and this court should not preclude a class of valid personal tort claims on mere conjecture.

The majority also expresses concern that the tort-feasor spouse will be allowed to benefit from his wrongful conduct, by sharing in any insurance proceeds recovered, or by recovery in actions for either loss of consortium or wrongful death. A similar argument was advanced and rejected in *Freehe v. Freehe,* 81 Wash. 2d at 191-92. It was argued that under the community property laws of that state, the tort-feasor-husband would acquire one-half interest in the insurance proceeds and would be vested with the control of its distribution, thereby benefitting from his own wrongful conduct. The *Freehe* court disposed of this argument, noting its

erroneous assumption "that courts are incapable of fashioning a remedy appropriate to a newly recognized enforceable claim of relief." Married people in Kansas quite frequently own property as individuals. They seem to have no trouble handling it in a sensible way without interspousal disharmony. There is no indication that any great problem in this regard has arisen in other states which have abolished the doctrine of interspousal immunity.

I am convinced that the retention of interspousal immunity can no longer be justified either by any public policy or by logic. The time has come for this court to overrule *Sink* and its progeny and to allow interspousal tort actions. For the reasons set forth above, I would reverse and remand the case to the district court for further proceedings.

HERD, J., joins the foregoing dissenting opinion.